# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

ILLINOIS TOOL WORKS, INC. dba
WYNN'S, a Delaware Corp.,

Plaintiff,

vs.

MOC PRODUCTS COMPANY, INC., a
California Corp.,

Defendant.

CASE NO. 09CV1887 JLS (MDD)

**ORDER (1) GRANTING IN PART
AND DENYING IN PART
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT OF
INFRINGEMENT; (2) DENYING
DEFENDANT'S MOTION FOR
SUMMARY ADJUDICATION FOR
INVALIDITY OF U.S. PATENT
NO. 6,073,638 PURSUANT TO 35
U.S.C. § 102 AND UNDER THE
DOCTRINE OF LACHES; AND
(3) GRANTING IN PART AND
DENYING IN PART
DEFENDANT'S MOTION FOR
SUMMARY ADJUDICATION FOR
INVALIDITY OF U.S. PATENT
NOS. 6,112,855 AND 5,806,629 AND
NON-INFRINGEMENT OF U.S.
PATENT NO. 5,806,629 AND NO
LIABILITY UNDER THE
DOCTRINE OF EQUITABLE
ESTOPPEL**

(ECF Nos. 162, 172, 175)

Presently before the Court are Plaintiff Illinois Took Works, Inc. d/b/a Wynn's' ("ITW")

motion for summary judgment of infringement, (ITW Mot. Summ. J. ("MSJ"), ECF No. 162),

Defendant MOC Products Company's ("MOC") motion for summary adjudication for invalidity of

U.S. Patent No. 6,073,638 ("the '638 Patent") pursuant to 35 U.S.C. § 102 and under the doctrine

of laches, (MOC '638 MSJ, ECF No. 172), and MOC's motion for summary adjudication for

invalidity of U.S. Patent Nos. 6,112,855 ("the '855 Patent") and 5,806,629 ("the '629 Patent") and non-infringement of the '629 Patent and no liability under the doctrine of equitable estoppel, (MOC '855 & '629 MSJ, ECF No. 175).  Also before the Court are the associated oppositions and replies.  The Court heard oral argument on February 9, 2012, and the matter was thereafter taken under submission.  Having considered the parties' arguments and the law, the Court:

(1) **DENIES** ITW's motion for summary judgment for inducement of infringement of Claims 1 and 5 of the '638 Patent;

(2) **GRANTS** ITW's motion for summary judgment for infringement of Claim 3 of the '629 Patent;

(3) **GRANTS** ITW's motion for summary judgment for infringement of Claims 14–17 of the '855 Patent;

(4) **DENIES** MOC's motion for summary adjudication for invalidity of Claims 1–3 and 5–8 of the '638 Patent pursuant to 35 U.S.C. § 102(a);

(5) **DENIES** MOC's motion for summary adjudication as to the defense of laches;

(6) **GRANTS** MOC's motion for summary adjudication for invalidity of Claims 2 and 3 of the '629 Patent and Claims 1, 3–5, and 14–17 of the '855 Patent pursuant to § 102(b);

(7) **DENIES** MOC's motion for summary adjudication for invalidity of the '629 and '855 Patents pursuant to § 102(f);

(8) **DENIES** MOC's motion for summary adjudication for non-infringement of Claims 1–5, 14, and 15 of the '629 Patent;

(9) **GRANTS** MOC's motion for summary adjudication for invalidity of Claims 1, 4, 5, 14, and 15 of the '629 Patent pursuant to § 103; and

(10) **DENIES** MOC's motion for summary adjudication for no liability under the doctrine of equitable estoppel.

//
//
//
//

09cv1887

**BACKGROUND**

**1. Factual and Procedural Background**[1]

ITW and MOC are competitors, and both develop and sell products for cleaning automotive parts, including but not limited to engines and transmissions. The patents in suit are the '638 Patent, concerning the cleaning of an automotive engine, and the '629 and '855 Patents, pertaining to a machine for flushing automatic transmission fluid ("ATF") from vehicles and its associated hoses and adapters.

The relevant industry is a small one, and apparently "very incestuous." (Decl. of Sean Kneafsey in Supp. of ("ISO") Resp. in Opp'n to ITW MSJ ("Kneafsey Decl.") Ex. D, at 121, ECF No. 182-7 (deposition of Richard Scott ("Scott"), Wynn's technical manager)) ITW—in the instant case doing business as "Wynn's"—has a long and involved relationship with MOC. In 2006, ITW purchased Quantum Marketing, Inc. ("QMI"), a privately held Florida corporation that had purchased servicing equipment from MOC since 2003, and that developed one of the asserted prior art devices. (Decl. of William A. Crowe ISO Opp'n to MOC's Mot. to File First Am. Answer ("Crowe Decl.") ¶ 2, ECF No. 55-2)

Additionally, Michael Camacho ("Camacho"), one of the original inventors of the '638 Patent while working at Wynn's, eventually left Wynn's to become MOC's General Manager of Equipment Development. Then, at MOC he was responsible for engineering MOC's accused products, the Universal Induction Tool and the ATF Exchange Machine. (Decl. of Brian Arnold ISO ITW MSJ ("Arnold Decl.") Ex. 24, at 313, 322–23, ECF No. 191-24 (deposition transcript of Camacho)); (Camacho Decl. ISO Resp. in Opp'n to ITW MSJ ¶ 2, ECF No. 182-1) MOC's accused products have been in the marketplace since 2001, or at least since 2003. (Decl. of Mark Waco ISO Opp'n to ITW MSJ ("Waco Decl.") ¶¶ 4, 8, ECF No. 182-2); (Statement of Facts ISO ITW MSJ ¶¶ 33, 41, 60, ECF No. 162-1)

---

[1] At the outset, the Court notes that despite having an opportunity to refile its exhibits with the Court after being notified that many were missing or were otherwise deficient, many of ITW's citations are to exhibits or pages of exhibits that the Court does not have before it, or the citations point to the wrong exhibits or pages in the record. In these instances, the Court has—where possible—identified and cited to other relevant portions of the record. However, it is not the task of the Court "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). This is ITW's task.

1    ITW initiated this patent infringement suit against MOC on August 28, 2009. (Compl.,

2    ECF No. 1)  The Court issued an Order on claim construction on May 12, 2011. (Order on Claim

3    Construction, ECF No. 99)  Subsequently, MOC filed five separate motions for summary

4    adjudication, (ECF Nos. 121, 147, 149, 150, 153), which the Court Ordered be consolidated,

5    (Order, Oct. 11, 2011, ECF No. 160).  Accordingly, the Court now has before it MOC's two

6    motions for summary adjudication, (ECF Nos. 172, 175), and ITW's motion for summary

7    judgment, (ECF No. 162).

8    **2. The Patents in Suit**

9    *A.  The '638 Patent   – Method and Apparatus for Cleaning an Automotive Engine*

10       The '638 Patent is an "apparatus and method for cleaning the intake system of an internal

11   combustion engine, such as an automatic engine." '638 Patent, at [57].  The invention solves two

12   problems that arise when cleaning engines with liquid non-aerosol cleaners: (1) nonuniform

13   distribution of cleaner within the engine intake, and (2) puddling of the cleaner.  The patent solves

14   these problems by atomizing the liquid cleaner.

15       Essentially, the invention of the '638 Patent delivers a liquid cleaner into an automobile

16   engine in an "atomized" spray form.  The invention accomplishes this by using an "aspirator,"

17   which the Court previously construed as "a fitting through which liquid, and sometimes air,

18   passes." (Order on Claim Construction 6, ECF No. 99)  The aspirator is connected at one end to

19   the cleaning fluid source and at the other end to the intake manifold of the engine.  As the liquid

20   cleaner and ambient air are simultaneously drawn into the aspirator by the intake manifold vacuum

21   created by the engine, the cleaner is atomized, turning into a fine spray.

22       Most relevant here, Claim 1 of the '638 Patent claims a "service method for cleaning the

23   intake system of an automotive internal combustion engine temporarily utilizing ambient air bleed

24   and intake manifold vacuum of the operating engine to temporarily ingest a liquid cleaner in

25   atomized form during said service." '638 Patent col.7 ll.9–13.  Claim 5 covers a similar "method

26   of substantially preventing puddling of liquid engine cleaner in the intake manifold of an internal

27   combustion engine during a temporary service procedure to clean said intake manifold." '638

28   Patent col.8 ll.6–9.

***B. The '629 Patent – Apparatus and Method for Service of an Automotive Automatic Transmission***

The '629 Patent is a "fail-safe transmission service machine [that] allows old ATF to be pumped out of a transmission while the vehicle engine runs, and responsively pumps a matching volume of new ATF into the transmission so that dry running of the transmission can not occur." '629 Patent, at [57]. Essentially, the invention exchanges old and new fluid in an automatic transmission system without letting the system operate with insufficient fluid levels, otherwise known as "running dry." The invention achieves this goal by ensuring that equal amounts of old and new transmission fluid are exchanged.

Claim 2 of the '629 Patent claims a "fail-safe method of exchanging ATF in an automatic transmission," '629 Patent col.11 ll.66–67, including, among others, the following limitation: "including in said external ATF circulation loop only a single three-way valve in a first position communicating ATF in said external ATF circulation loop and in a second position opening said external ATF circulation loop and directing ATF from the transmission to waste," '629 Patent col.12 ll.3–7. Claim 3 of the patent claims a "fail-safe transmission fluid exchange machine for an automotive automatic transmission," including a similar limitation:

> a conduit for conducting ATF from said external ATF circulation loop, only a single three-way valve in a first position communicating ATF received via said first conduit from said external circulation loop to a second conduit, which second conduit returns ATF to said external ATF circulation loop, said only a single three-way valve in a second position thereof communicating ATF from said external ATF circulation loop to waste; a yieldably-biased back-drivable actuator which when actuated moves said only a single three-way valve from said first to said second position thereof and which when deactivated returns said only a single three-way valve to said first position by self-bias.

'629 Patent col.12 ll.32–44.

The three-way valve disclosed in these two claims is yieldably-biased to its first position, but the control system allows the three-way valve to switch into its second position when activated. '629 Patent col.12 ll.10–13. Claims 2 and 3 also disclose a sensor that indicates when there is an adequate supply of new ATF. '629 Patent col.12 ll.15–25 (Claim 2); '629 Patent col.12 ll.46–55 (Claim 3). The control system will allow the three-way valve to move into its second position only when the sensor indicates that there is an adequate supply of new ATF.

1    To operate, the invention of the '629 Patent utilizes a "motor/pump unit," which the Court

2  previously construed as "a part having a motor and a pump."  (Order on Claim Construction 5,

3  ECF No. 99)  Claims 1, 14, and 15 each provide limitations whereby the old ATF flows via a

4  "rotary motor" portion of the motor/pump unit to the waste.  By doing so, the old ATF thereby

5  drives a "rotary pump," which pumps in an equal volume of new ATF.  '629 Patent col.11 ll.51–57

6  (Claim 1); '629 Patent col.17 ll.52–58 (Claim 14); '629 Patent col.18 ll.7–13 (Claim 15).

7  **C. The '855 Patent – Apparatus and Method for Cleaning an Automotive Automatic**

8  **Transmission**

9    The '855 Patent is a machine comprised of "a set of primary hoses, a set of intermediate

10  hoses, and a set of plural pairs of complementary adapter fittings which in combination adapt the

11  machine for convenient service of a wide variety of automobiles and their transmissions."  '855

12  Patent, at [57]  "This variability or flexibility of connection for the machine allows a very limited

13  number of primary hoses, intermediate hoses, and adapters to interface the machine flexibly with a

14  wide variety of different transmission, and the different vehicles in which these transmissions are

15  installed."  *Id.*

16    Most relevant to the instant motion, Claim 14 of the '855 Patent covers the combination of

17  an ATF exchange machine with a set of plural pairs of adapters.  '855 Patent col.19 ll.10–50,

18  col.20 ll.1–6 (Claim 14).  The machine includes a set of primary hoses with quick-disconnect

19  coupling portions at one end, and a set of intermediate hoses with quick-disconnect coupling

20  portions at both ends.  '855 Patent col.19 ll.23–49.  And, the machine has a set of plural pairs of

21  adapters, each of which on one end is complementary to the quick-disconnect portions of the

22  intermediate hoses, and on the other end is complementary to the other adapter and is adapted to

23  connect to the vehicle.  '855 Patent col.19 ll.50–51, col.20 ll.1–6.

24    Claims 15 through 17 of the '855 Patent depend on Claim 14, and include additional

25  limitations on specifying the composition of the end termination portions of the adapters.  Claim

26  15 covers termination portions complementary to a hose, '855 Patent col.20 ll.7–9, Claim 16

27  covers those complementary to a pipe thread, '855 Patent col.20 ll.10–12, and Claim 17 covers

28  those complementary to a flare tube fitting, '855 Patent col.20 ll.13–15.

**3. The Accused Products**

***A. MOC's Universal Induction Tool***

ITW moves for summary judgment that MOC induces service technicians to use its Universal Induction Tool to infringe the '638 Patent.  In 2001, MOC began selling, distributing, and demonstrating at trade shows its Universal Induction Tool, an apparatus for cleaning the intake system of an automobile engine.  (Waco Decl. ¶ 4, ECF No. 182-2)  The device was designed and developed by Camacho.  MOC's Universal Induction Tool utilizes an aspirator to atomize the cleaning fluid as it is introduced into the engine, thereby preventing potentially harmful puddling of the fluid.  (Arnold Decl. Ex. 17, at 265, ECF No. 191-20 (deposition transcript of MOC's expert witness, Eduardo Betancourt)); (Arnold Decl. Ex. 8, ECF No. 191-14 (showing an image of MOC's website indicating that the Universal Induction Tool "[a]tomizes cleaning fluid")).  To do so, MOC's device utilizes a metal nozzle that attaches to the intake manifold.  (Arnold Decl. Ex. 24, at 328, ECF No. 191-24 (indicating that the metal nozzle on the Universal Induction Tool ingests air and liquid))

***B. MOC's ATF Exchange Machine & Adapters***

ITW moves for summary judgement that MOC's ATF Exchange Machine and adapters infringe the '629 and '855 Patents.  MOC's ATF Exchange Machine was designed and developed by Camacho.  (Decl. of Camacho ISO MOC '855 & '629 MSJ ("Camacho Decl.") ¶ 2, ECF No. 175-4)  Like ITW's patented invention, the ATF Machine replaces old ATF with a substantially equal volume of new ATF while the engine is running.  To accomplish this, "[u]sed ATF flows from the vehicle into the MOC machine and into a manifold . . . containing two, 3-way valves . . . and one, 2-way valve."  *Id.* ¶ 3.

The ATF Machine functions in several different "modes," including "service mode," "top off mode," "drain trans pan mode," "loop mode," and "drain used fluid mode."  (*See* Kneafsey Decl. Ex. H, ECF No. 182-11)  Most relevant here are "loop mode" and "service mode."

In loop mode, MOC's ATF Machine conducts ATF from the vehicle via a conduit connected to a three-way valve in a "first" or "closed" position.  When the ATF reaches the three-way valve in its first/closed position, it is communicated to a second conduit that returns the fluid

to the vehicle.  (*Id.* at 4)  Thus, in loop mode, MOC's ATF Exchange Machine does not allow the escape of any of the used transmission fluid, instead running it directly back into the automatic transmission system.

By contrast, in service mode, the ATF Exchange Machine conducts ATF from the vehicle via a conduit connected to the same three-way valve, but in service mode the valve is in its "second" or "open" position.  When the ATF reaches the three-way valve in its second/open position, the fluid is communicated to a used fluid tank or "waste" container.  As this is happening, the ATF Exchange Machine simultaneously replaces the used ATF with new transmission fluid. (*Id.* at 1)  Thus, in service mode, MOC's ATF Exchange Machine simultaneously removes old ATF and replaces it with an equal volume of new ATF, ensuring that the vehicle transmission never runs dry.

To operate, MOC's ATF Exchange Machine utilizes a "dual-pump design run by a high-powered electric motor."  (Camacho Decl. ISO MOC '855 & '629 MSJ ¶ 10, ECF No. 175-4)  The electric motor causes the machine's double pumps to rotate, one pumping out old ATF while the other pumps in new ATF.  (*Id.*)

Finally, MOC's ATF Exchange Machine includes a set of primary and a set of intermediate hoses, and uses a set of plural pairs of complementary adapter fittings.  (*See* Arnold Decl. Ex. 33, at 1, ECF No. 197-9 (ATF-Exchanger-Service Procedures)); (Arnold Decl. Ex. 19, at 27–34, ECF No. 191-21 (expert report))  The adapters have end portions complementary to a hose, a pipe thread, or a flare tube fitting.  (*Id.* Ex. 19, at 34, ECF No. 191-21)

### LEGAL STANDARD

Federal Rule of Civil Procedure 56 permits a court to grant summary judgment where (1) the moving party demonstrates the absence of a genuine issue of material fact and (2) entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material," for purposes of Rule 56, means that the fact, under governing substantive law, could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).  For a dispute to be "genuine," a reasonable jury must be able to return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The movant can carry his burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id*. at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains. *Celotex*, 477 U.S. at 324. The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256. When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

As an initial matter, in their motions the parties dispute whether—assuming the Court grants summary judgment in MOC's favor as to its invalidity arguments—it need reach the issue of infringement. While it is true that "an invalid claim cannot give rise to liability for infringement, whether it is infringed is an entirely separate question capable of determination without regard to its validity." *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1583 (Fed. Cir. 1983). Indeed, the Federal Circuit has indicated that the "better practice" is to decide both issues "[b]ecause both validity and infringement involve construction of a claim, and because the construction must be the same in determining both." *Id.*; *see also Mentor Graphics Corp. v. Quickturn Design Sys.*, C00-1030, 2003 U.S. Dist. LEXIS 16195, at *9–10 (N.D. Cal. July 30, 2003) ("[T]he Federal Circuit has made it clear that infringement and invalidity should both be decided on the merits when raised, especially when invalidity is asserted as a counterclaim rather than an affirmative defense."). Accordingly, the Court will consider both issues here.

//

1    **1. '638 Patent**

2    *A. Inducement of Infringement*

3    Under 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be

4    liable as an infringer." 35 U.S.C. § 271(b). "To prevail on inducement, the patentee must show,

5    first that there has been direct infringement, and second that the alleged infringer knowingly

6    induced infringement and possessed specific intent to encourage another's infringement."

7    *Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1353–54 (Fed. Cir. 2008) (internal quotation

8    marks omitted).

9    *(1) Direct Third-Party Infringement*

10   Liability for inducement of infringement cannot lie where there has been no direct

11   infringement. *Dynacore Holdings Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir.

12   2004). Here, ITW argues and MOC does not dispute that when a technician performs a service on

13   an automobile using MOC's accused infringing device—the Universal Induction Tool—Claims 1

14   and 5 of the '638 Patent are infringed. (*See* Resp. in Opp'n to ITW MSJ 1–4, ECF No. 182

15   (opposing summary judgment of infringement only on the bases that (1) the '638 patent cannot be

16   infringed because it is invalid and (2) it is a disputed fact whether MOC knew that the induced acts

17   constituted patent infringement))[2] Because the Court finds that there is a genuine issue of fact as

18   to the knowledge element, however, summary judgment as to the inducement of infringement

19   claim is not appropriate.

20   *(2) Knowledge of Third-Party Direct Infringement*

21   "[T]he specific intent necessary to induce infringement 'requires more than just intent to

22   cause the acts that produce direct infringement. Beyond that threshold knowledge, the inducer

23   must have an affirmative intent to cause direct infringement.'" *Kyocera Wireless*, 545 F.3d at 1354

24   (quoting *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc)). The

25   Supreme Court recently explained that "induced infringement under § 271(b) requires knowledge

26

27   [2] MOC also opposes summary judgment of infringement on the basis that ITW has presented
     no evidence of direct infringement. (Resp. in Opp'n to ITW MSJ 1–3, ECF No. 182) ITW seeks
28   summary judgment only that MOC induces infringement, however, not that it directly infringes.
     (Reply in Supp. ITW MSJ 2 n.3, ECF No. 186)

that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011). The Court further held that under this standard actual knowledge is not required, but that the doctrine of willful blindness applies to inducement of infringement claims such that a defendant may not avoid inducement liability by deliberately avoiding actual knowledge that the acts it induces constitute patent infringement. *Id.* at 2069. For the doctrine to apply, "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id.* at 2070; *see also id.* at 2070–71 (comparing willful blindness to recklessness and negligence and stating that "[u]nder this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts").

In determining whether Defendants possessed such intent, "direct evidence is not required; rather, circumstantial evidence may suffice." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005) (internal quotation marks omitted). Indeed, "[t]he requisite intent to induce infringement may be inferred from all of the circumstances." *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir. 1988).

Neither party disputes that MOC knew of the existence of the '638 Patent. In fact, Camacho, MOC's General Manager of Equipment Development, is named as an inventor on the patent. Less clear, however, is whether MOC knew—or was willfully blind to the fact—that the acts it induced service technicians to perform by using MOC's Universal Induction Tool constituted infringement of the '638 Patent.

ITW argues that "MOC knows – and has known – that the Universal Induction Tool infringes the '638 patent when used," based on MOC's admitting that the accused product atomizes cleaning fluid. (ITW MSJ 18, ECF No. 162) Alternatively, ITW contends that if MOC did not know that the induced acts constituted patent infringement it was because it took deliberate actions to avoid knowing. ITW supports this contention with the fact that Camacho, one of the original inventors on the '638 Patent, was "responsible for engineering MOC's infringing Universal Induction Tool." (*Id.* (citing (Arnold Decl. Ex. 24, at 313, 322, ECF No. 191-24

1   (deposition transcript of Camacho)))  If Camacho failed to engineer MOC's accused product in a

2   way that would avoid infringing the '638 Patent when used by a service technician, then according

3   to ITW this fact would be plainly evident to MOC if it had conducted tests on the device.

4       MOC's main argument in opposition is that despite the fact that MOC's Universal

5   Induction Tool was known by ITW since 2001, ITW never indicated to MOC that use of its device

6   infringed the '638 Patent, and therefore MOC did not know and had no reason to suspect that use

7   of its product infringed ITW's patent.  (Resp. in Opp'n to ITW MSJ 3–4, ECF No. 182)  Though

8   ITW is correct that the knowledge inquiry "focuses on MOC's knowledge—not on [ITW]'s

9   actions or inactions," (Reply in Supp. ITW MSJ 2 n.4, ECF No. 186), the Court finds that, viewing

10  the evidence in the light most favorable to MOC, ITW's inaction can have some bearing on

11  whether MOC knew the acts it induced were infringing.

12      Through MOC's sale, distribution, and demonstration of the Universal Induction Tool,

13  ITW was aware of the device since 2001. (Resp. in Opp'n to ITW MSJ 3–4, ECF No. 182 (citing

14  (Waco Decl. ¶¶ 4–15, ECF No. 182-2); (Kneafsey Decl. Ex. D, at 118–21, ECF No. 182-7)))  Had

15  ITW indicated to MOC at any point that it believed MOC's product infringed the '638 Patent, this

16  would suggest that MOC—at a minimum—"subjectively believe[d] that there [wa]s a high

17  probability" that its product was infringing.  *Global-Tech*, 131 S. Ct. at 2070.  But ITW never

18  made such an indication.  And, according to MOC, "when MOC was informed of ITW's allegation

19  that its design was infringing, MOC redesigned its product and sought clearance from ITW's

20  attorneys that its redesign was not infringing."  (Reply in Supp. MOC '638 MSJ 10, ECF No.

21  205); (Waco Decl. ¶ 4, ECF No. 205-1); (Waco Decl. Ex. GG, ECF No. 205-9)  Thus, once MOC

22  knew of a high probability of infringement, it took deliberate action to avoid infringing, not to

23  avoid discovering whether it was infringing.

24      Moreover, though ITW makes much of the fact that Camacho was both an inventor on the

25  '638 Patent and responsible for the design of the Universal Induction Tool, this fact can tilt in

26  either party's favor.  But, on summary judgment, it must tilt toward MOC.  Camacho's

27  involvement in the engineering of both devices could suggest that, in an effort to avoid the present

28  dispute, Camacho attempted to design the Universal Induction Tool in such a way that it would not

infringe on the '638 Patent.  Indeed, Camacho testified at his deposition that he designed the nozzle of the device in such a way "[a]s . . . not to infringe upon the patent."  (Kneafsey Decl. Ex. I, at 350, ECF No. 182-12 (deposition of Camacho))  This would suggest that at least Camacho—and by extension, MOC—subjectively believed that the accused product did not infringe the '638 Patent at the time it was first engineered.

Even accepting this version of the facts, however, ITW argues that "even if Mr. Camacho had this belief when he designed the tool years ago, he eventually knew [that the product was infringing]."  (Reply in Supp. ITW Mot. Summ J. 3, ECF No. 186)  Camacho indicated that at the time he developed the Universal Induction Tool, his basis for believing that it was non-infringing was that it utilized a "bore of a varying internal diameter" in the nozzle.  (Kneafsey Decl. Ex I, at 350, ECF No. 182-12)  But, as ITW points out, at no point during the instant action has MOC asserted the bore of a varying internal diameter as a basis for non-infringement.  From this, ITW deduces that at some point MOC became aware of the fact that despite utilizing the bore of a varying internal diameter, the Universal Induction Tool infringed on the '638 Patent.

It is true that MOC has not contested that when used by service technicians the Universal Induction Tool infringes the '638 Patent.  And MOC has not raised the use of bore of a varying internal diameter as a defense to ITW's charge of infringement.  Nevertheless, the Court finds MOC has carried its burden to establish a genuine issue as to whether it had knowledge that the acts it induced were infringing, and the Court is hesitant to infer such knowledge from MOC's litigation strategy.

Accordingly, for all the reasons discussed, the Court finds that there is a genuine issue regarding the knowledge element of the inducement of infringement claim.  Thus, ITW's motion for summary judgment of infringement is **DENIED** as to inducement of infringement of the '638 Patent.

### B. Invalidity

In its motion, MOC asserts that Claims 1–3 and 5–8 of the '638 Patent are invalid pursuant to 35 U.S.C. § 102(a).  Section 102 states in pertinent part that "[a] person shall be entitled to a patent" unless the invention has been anticipated because "the invention was known or used by

1    others in this country, or patented or described in a printed publication in this or a foreign country,

2    before the invention thereof by the applicant for patent."  35 U.S.C. § 102(a).  "It is well settled

3    that a claim is anticipated if each and every limitation [of the claim] is found either expressly or

4    inherently in a single prior art reference."  *Celeritas Techs., Ltd. v. Rockwell Intern. Corp.*, 150

5    F.3d 1354, 1361 (Fed. Cir. 1998); *see also Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1149 (Fed.

6    Cir. 2005).

7    *(1)  Prior Art*

8          The prior art references MOC contends invalidate the '638 Patent as anticipated are QMI's

9    induction tool and MOC's induction canister product.

10         Beginning in 1993, QMI—a corporation now wholly owned by ITW—began selling an

11   induction tool device and liquid cleaner, distributing a Technical/Instruction Manual along

12   therewith.  (*See* Kneafsey Decl. Ex. S, ECF No. 172-23 ("Technical/Instruction Manual"))  QMI's

13   induction tool was designed to deliver liquid cleaner through the intake manifold of an automobile

14   engine.  It accomplished this by utilizing an "air bleed tee," which was "designed to allow a slow

15   feed for proper atomization of the cleaner." (*Id.* at 28)

16         Beginning in April 1997, MOC introduced its Induction Canister Product #72122, which it

17   first developed and used sometime in 1996.  (MOC '638 MSJ 7–8, ECF No. 172)  MOC's

18   Induction Canister utilized hospital intravenous bottles to deliver liquid cleaner into automobile

19   engine intake manifolds.  (*Id.* at 7)  The MOC device contained a "y-connector" aspirator fitting,

20   and connected to the y-connecter there was a short hose with a nozzle at the end.  (*Id.* (citing

21   Kneafsey Decl. Ex. L, ECF No. 172-16 (photographs of MOC's Induction Canister)))

22   *(2)  Analysis*

23         ITW contends that QMI's induction tool[3] does not anticipate the '638 Patent because it

24   does not atomize the liquid cleaner and because it does not utilize an aspirator.  Independent

25   Claims 1 and 5 of the '638 Patent require the use of an aspirator to atomize liquid cleaner while

26

27         [3] ITW collapses the two prior art references into one discussion, focusing primarily on QMI's
     induction tool.  Because none of ITW's arguments are unique to MOC's Induction Canister, for
28   simplicity the Court discusses only QMI's induction tool here, and notes that the analysis is identical
     for the MOC Induction Canister.

introducing it into the intake system.  '638 Patent col.7 ll.9–13, col.8 ll.6–9.

(a)  "Atomize"

According to ITW, QMI's induction tool does not atomize the liquid cleaner.  Rather, the liquid cleaner is emitted from the nozzle in a "sputtering stream," not a "fine spray."[4]  (Resp. in Opp'n to MOC '638 MSJ 6, ECF No. 187)  And although the Technical/Instruction Manual uses the term "atomize" to describe QMI's induction tool, ITW contends that "these references mean something other than 'reduce to a fine spray.'"  (*Id.* at 7)  Specifically, ITW contends that in using the term "atomize," QMI meant simply that the cleaning fluid had mixed with air, not that it had been "reduced to a fine spray."  (*Id.* (citing (Arnold Decl. Ex. 72, at 7, 26, 70–74, 81–82, ECF No. 191-66 (deposition of Larell Willis ("Willis"), QMI's founder and designer of QMI's induction tool)); (Arnold Decl. Ex. 73, at 82–83, ECF No. 191-67 (deposition of Alan Ferry ("Ferry"), QMI's director of research and marketing))))

Willis's and Ferry's deposition testimony regarding the meaning of the term "atomize" as used by QMI is hardly determinative.  In his deposition, Willis explained the meaning of "proper atomization of the cleaner" as "get[ting] air involved . . . so it will atomize the fuel . . . .  [I]t would be a spray or a mist or a sudsy, . . . [it] allowed air to be mixed with it so that it would be fine, fine, fine; it wouldn't just be a heavy liquid."  (Arnold Decl. Ex. 72, at 26–27, ECF No. 191-66)  He additionally described the cleaner and air mixture as "a fog," (*id.* at 28), "a very fine particle," (*id.* at 31), a "foggy, foamy, fine—fine mist kind of state," (*id.* at 32), "a vapor . . . even finer than a spray," (*id.* at 73), and "a gassy state," (*id.* at 83).  Ferry described atomization as "bring[ing] air in to mix with the liquid," (Arnold Decl. Ex. 73, at 34, ECF No. 191-67), and stated that by using the term "atomized" he meant "[s]imply that the air and liquid are mixed together," (*id.* at 83).

MOC contends, however, that the myriad terms used by Willis and Ferry all mean the same thing: that the liquid cleaner is reduced to a fine spray.  (Reply in Supp. MOC '638 MSJ 4, ECF No. 205)  And, in support of this contention, MOC points to the '638 Patent itself, which uses the term "fog" to describe the atomized cleaner.  (*Id.* (citing '638 Patent col.2 ll.62–64; '638 Patent

---

[4] The parties agree that the term "atomized"—as used in the '638 Patent—means "reduced to a fine spray."  (Joint Claim Construction Worksheet 13, ECF No. 34)

1    col.7–8))

2         ITW further supports its contention that QMI's induction tool does not atomize with a

3    demonstration of QMI's induction tool that shows that it produces a "sputtering stream" rather

4    than a fine spray.[5] (Arnold Decl. Ex. 69 (ITW's demonstration of QMI's induction tool)) That

5    QMI's induction tool produces a "sputtering stream" rather than a fine spray suggests that by using

6    the term "atomize" to describe its device QMI meant only that the device mixed the liquid cleanser

7    with air, not that it reduced it to a fine spray.

8         MOC argues, however, that ITW's test is an "extremely misleading demonstration of the

9    evidence." (Reply in Supp. MOC '638 MSJ 6, ECF No. 205) MOC contends that ITW's

10   demonstration "shows that the valve was opened so that the resulting spray would be as heavy as

11   possible," and that MOC's test on the same device after "adjust[ing] the valve as instructed by the

12   QMI 1994 Instruction Manual . . . create[d] a fine spray." (*Id.* at 7 (citing Kneafsy Decl. Ex. CC,

13   ECF No. 205-5 (MOC's demonstration of QMI's induction tool)) Indeed, the

14   Technical/Instruction Manual cautions that users must "[a]djust the valve so the intake cleaner is

15   pulled <u>slowly</u> into the engine. . . . The intake cleaner must be converted into a gas before it enters

16   the cylinder." (Kneafsey Decl. Ex. S, at 27, ECF No. 172-23) And, using the device as instructed,

17   MOC argues that its demonstration shows that it is capable of producing a fine spray. (Kneafsy

18   Decl. Ex. CC, ECF No. 205-4)

19        The parties addressed this issue at length at the February 9, 2012, hearing. The Court has

20   also reviewed the video exhibits submitted by both parties. Considering all the evidence, the

21   Court must find that there is a disputed issue whether the prior art devices "reduced to a fine

22   spray" the liquid cleanser. Accordingly, MOC's motion for summary judgment for invalidity is

23   **DENIED**.

24   //

25   _____

26        [5] MOC argues that "[t]o prevail on its motion, MOC does not need to prove that QMI's
     physical device was capable of atomizing the liquid cleaner," and therefore ITW's test on QMI's
27   induction tool does not bear on whether the '638 Patent was anticipated. (Reply in Supp. MOC '638
     MSJ 3, ECF No. 205) The Court does not contest this characterization of the law on anticipation, but
28   considers ITW's test relevant to its contention that QMI meant something other than "reduce to a fine
     spray" when it used the term "atomize."

(b)  "Aspirator"

According to ITW, even if QMI's induction tool atomizes the liquid cleaner, it does not utilize an aspirator to do so.  Independent Claims 1 and 5 of the '638 Patent require "utilizing an aspirator . . . to atomize."  '638 Patent col.7 ll.18–19; '638 Patent col.8 ll.14–16.  In this Court's Order on claim construction, it found that the proper construction of "aspirator" is "a fitting through which liquid, and sometimes air, passes."  (Order on Claim Construction 6, ECF No. 99)

ITW does not dispute that the "air bleed tee" in QMI's induction tool is an aspirator. (Resp. in Opp'n to MOC '638 MSJ 7, ECF No. 187)  However, ITW contends that because the air bleed tee "only allows air to enter the stream," the device does not "utilize the aspirator[] to atomize the liquid . . . as it enters the intake manifold."  (Resp. in Opp'n to MOC '638 Patent 7, ECF No. 87)[6]  Instead, ITW contends that it is the "combination of the air bleed tee, hose and nozzle" that atomizes the liquid as it enters the intake system.  (*Id.*)  And, according to ITW, this combination "is not a fitting.  Rather, a 'fitting' . . . must be a single piece."  (*Id.*)

MOC argues that ITW is mistaken in its contention that "the claims require the liquid cleaner to exit the aspirator and immediately enter the intake manifold in an atomized state." (Reply in Supp. MOC '638 MSJ 8, ECF No. 205)  The Court agrees.  Even if the term "a fitting" requires that the aspirator be a single piece, and even if there is an intervening hose between that piece and the point at which the cleaner enters the intake system in an atomized form, ITW has not shown that the device does not "utilize" the aspirator to atomize.

Indeed, ITW's own patent envisions the possibility of an intervening hose between the aspirator and the intake system.  Referring to Figure 2 (reproduced below), according to the preferred embodiment of the '638 Patent invention, the "aspirator fitting" need not directly connect to the intake system:

> At its distal end portion **42b**, the hose **42** is connected to an aspirator fitting, generally indicated with the numeral **48**.  In the illustrated case, the aspirator fitting **48** is connected to a PCV valve (i.e., positive crankcase ventilation) hose

---

[6] As did MOC, the Court has difficulty deciphering ITW's argument here.  It appears ITW is contending that because there is an intervening step between the air bleed tee and the point at which the atomized cleaner enters the intake system, QMI's device is not "utilizing" the air bleed tee to atomize.  ITW did not clarify its argument at oral argument, instead focusing on whether the prior art device atomizes.  (*See* Official Tr. 12–14, ECF No. 218)

**50**, which has been temporarily disconnected to allow the engine **12** to be cleaned.  Those ordinarily skilled in the pertinent arts will understand that the fitting **48** need not be installed into access with the intake system **12a** via a PCV hose.  Any convenient and accessible fitting or connection of sufficient size which opens into the intake system **12a** so as to have intake manifold vacuum during operation of the engine **12** will be acceptable for this purpose.

'638 Patent col.4, ll.46–57.



_FIG. 2._

It is plain from this description that the aspirator fitting need not be connected to the intake system directly; rather, as in the illustration, it may be connected to a PCV valve hose or other "convenient and accessible fitting or connection of sufficient size." *Vitrionics Corp. v. Conceptronic*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (indicating that an interpretation of a claim term that would exclude the preferred embodiment "is rarely, if ever, correct").

Accordingly, because ITW does not dispute that the air bleed tee is an aspirator, the Court finds there is no genuine issue as to whether QMI's induction tool "utilizes an aspirator . . . to atomize."  However, because there is a genuine issue whether the prior art atomizes, MOC's motion for summary judgment for invalidity of the '638 Patent is **DENIED**.

### C.  Defense of Laches

As an affirmative defense, assuming the validity of the '638 Patent, MOC asserts that ITW should be precluded from receiving any pre-filing damages under the doctrine of laches.  Laches is a defense to patent infringement where the defendant proves by a preponderance of the evidence

that (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant"; and (2) "the delay operated to the prejudice or injury of the defendant." *A.C. Auckerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc). "The period of delay is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit." *Id.*

A presumption of laches arises if "the patentee delayed filing suit for more than six years after actual or constructive knowledge of the defendant's alleged infringing activity." *Id.* at 1035–36. Once a defendant establishes that this presumption applies, the burden shifts to the plaintiff to "rebut the presumption of laches 'by offering evidence to show an excuse for the delay or that the delay was reasonable' or by offering evidence 'sufficient to place the matters of [evidentiary] prejudice and economic prejudice genuinely in issue.'" *Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1358 (Fed. Cir. 2008) (quoting *Auckerman*, 960 F.2d at 1038).

Here, MOC began selling, distributing, and demonstrating at trade shows the accused device—its Universal Induction Tool—in 2001. (MOC '638 MSJ 11, ECF No. 172 (citing Waco Decl. ¶¶ 5–7, ECF No. 172-3)) But, ITW did not initiate its patent infringement suit until August 28, 2009, well over six years after MOC first introduced its device. (Compl., ECF No. 1) And in its opposition brief, ITW does not dispute that the *Auckerman* presumption should apply here. Instead, ITW argues that MOC's "egregious conduct" of intentionally copying the '638 patented invention precludes application of the equitable doctrine of laches. (Resp. in Opp'n to MOC '638 MSJ 8, ECF No. 187)

"Even if unable to overcome the presumption, a patentee may be able to preclude application of the laches defense with proof that the accused infringer was itself guilty of misdeeds towards the patentee." *Auckerman*, 960 F.2d at 1038. This requires the plaintiff to show that the defendant "has engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor," such as "[c]onscious copying." *Id.* at 1033 (internal quotation marks omitted); *see also Bott v. Four Star Corp.*, 807 F.2d 1567, 1576 (Fed. Cir. 1986) (holding that defendant's "defense of laches was defeated by its egregious conduct" of "knowingly

1   cop[ying]" plaintiff's patented invention), *overruled on other grounds by Auckerman*, 960 F.2d at

2   1038.[7]

3       ITW contends that summary judgment on MOC's affirmative defense of laches is

4   inappropriate because there is a genuine issue of fact whether MOC intentionally copied ITW's

5   patented product and method.  The Court agrees.  Specifically, ITW points to the fact that

6   Camacho—a named inventor on the '638 Patent—was involved in the development of the

7   Universal Induction Tool soon after leaving ITW to join MOC.  And as the Court has already

8   indicated, this fact can tilt in either party's favor.  This time, it tilts toward ITW.  Viewing the

9   evidence in the light most favorable to ITW, Camacho's dual involvement not only suggests that

10  MOC had the ability to copy, but also that if the device is indeed a copy, the replication may have

11  been intentional.

12      Thus, the Court finds that ITW has carried its burden to establish a genuine issue as to

13  whether MOC engaged in "egregious conduct" by intentionally copying the patented invention

14  such that the equitable defense of laches cannot apply.  Accordingly, the Court **DENIES** MOC's

15  motion for summary judgment on its defense of laches.

16  **2. '629 Patent**

17  *A. Direct Infringement / Non-Infringement*

18      ITW moves for summary judgement that MOC directly infringes Claim 3 of the '629

19  Patent.  In its cross motion, MOC moves for summary judgment for non-infringement of Claims

20  1–5 and Claims 14–15.

21      In the context of patent litigation, "[i]nfringement is assessed by comparing the accused

22  device to the claims; the accused device infringes if it incorporates every limitation of a claim,

23  either literally or under the doctrine of equivalents.  If, however, even one claim limitation is

24  missing or not met, there is no literal infringement." *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 429

25  ────────────

26      [7] MOC attempts to distinguish this precedent by pointing out that the cases ITW cites in
    support of its unclean hands defense "for the most part were decided prior to the *Auckerman* decision."

27  (Reply in Supp. MOC '638 MSJ 9, ECF No. 205)  But in articulating the presumption of laches in its
    "landmark" decision, *Auckerman* explicitly upheld the unclean hands defense the Court relies on here.

28  *See Auckerman*, 960 F.2d at 1033 (citing with approval *Bott*, 807 F.2d 1567; *TWM Mfg. Co. v. Dura
    Corp.*, 592 F.2d 346 (6th Cir. 1979)); *see also id.* at 1038.  Thus, the Court finds MOC's arguments
    on this point unpersuasive.

1  F.3d 1344, 1352 (Fed. Cir. 2005).  Where there is a factual dispute as to whether the allegedly

2  infringing device includes a claim limitation, summary judgment is not appropriate.  *Int'l Rectifier*

3  *Corp. v. IXYS Corp.*, 361 F.3d 1363, 1375 (Fed. Cir. 2004).

4        Infringement analysis involves a two-step process: first, the Court must determine the

5  meaning of the disputed claim terms, and second, the Court must compare the accused device to

6  the claims as construed.  *Wavetronix v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1354 (Fed. Cir.

7  2009) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)).

8  *(1)  Claims 2–5*

9        Claims 2 and 3 of the '629 Patent—from which Claims 4 and 5 depend—contain

10  limitations requiring "only a single three-way valve."  '629 Patent col.12.  The parties dispute the

11  construction of the term "only a single three-way valve" in both of their motions.  This term was

12  not addressed in the Court's claim construction, and therefore must be construed for the first time

13  here.  *See Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l*, 560 F. Supp. 2d 893, 899 (N.D. Cal.

14  2008).

15  (a)  Claim Construction

16        The parties are well aware of the relevant legal standard to claim construction.  (*See* Order

17  on Claim Construction 1–3, ECF No. 99)  The Court construes the scope and meaning of disputed

18  patent claims as a matter of law.  *Markman*, 517 U.S. at 388–90.  Because the inquiry into the

19  meaning of claim terms is an objective one, the court looks to publicly available sources to show

20  what a person would have understood the claim language to mean.  *Innova/Pure Water, Inc. v.*

21  *Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  Those sources include

22  the claims, the specification, the prosecution history, and relevant extrinsic evidence.  *Id.*

23        Most relevant here, the prosecution history may inform claim construction.  *Vitronics*, 90

24  F.3d at 1582.  "Like the specification, the prosecution history provides evidence of how the [Patent

25  and Trademark Office ("PTO")] and the inventor understood the patent."  *Phillips*, 415 F.3d at

26  1317.  It can be useful to show "how the inventor understood the invention and whether the

27  inventor limited the invention in the course of prosecution, making the claim scope narrower than

28  it would otherwise be."  *Id.*

1    The root of the parties' dispute over the proper construction of "only a single three-way

2  valve" is whether the term limits the patent to covering a machine that uses just one three-way

3  valve, or whether it covers a machine that uses multiple three-way valves.  At oral argument, both

4  parties agreed with the Court's construction of the term "only a single three-way valve" as "only a

5  single three-way valve that alternatively completes or interrupts the external circulation loop."

6  (Official Tr. 16, 20, ECF No. 218)

7    In its motion, MOC contends that the term "only a single three-way valve" excludes

8  devices that utilize plural three-way valves.  (MOC '855 & '629 MSJ 20, ECF No. 175)  In

9  reaching this conclusion, MOC heavily relies on the prosecution history of the '629 Patent.[8]  In the

10  '629 Patent application, Claims 2 and 3 were initially rejected as being anticipated in the prior art.

11  (Kneafsey Decl. Ex. 25, at 25, ECF No. 175-31 ('629 Patent history file))  Accordingly, ITW

12  amended the problematic claims and resubmitted the patent application.  The relevant limitations

13  of Claims 2 and 3 were amended as follows (amended portions **bolded and underlined**):

14        *Claim 2*: including in said external ATF circulation loop **only** a **single** three-way
          valve in a first position communicating ATF in said external ATF circulation loop
15        and in a second position opening said external ATF circulation loop and directing
          ATF from the transmission to waste
16
          *Claim 3*: a conduit for conducting ATF from said external ATF circulation loop,
17        **only** a **single** three-way valve in a first position communicating ATF received via
          said first conduit from said external circulation loop to a second conduit, which
18        second conduit returns ATF to said external ATF circulation loop, said **only a**
          **single** three-way valve in a second position thereof communicating ATF from
19        said external ATF circulation loop to waste

20  *Compare* (*id.* at 22–23), *with* '629 Patent col.12.  ITW further explained its amendment by

21  indicating that the prior art

22        utilized plural three-way valves in order to provide a circulation loop which is
          also capable of interruption to allow old transmission fluid to flow to waste while
23        new transmission fluid flows into the transmission.  There is no teaching or
          suggestion in [the prior art] that the external circulation loop of a transmission can
24        alternatively be completed or interrupted (and restored when necessary) using
          only a single three-way valve.
25
26  (Kneafsey Decl. Ex. 25, at 62, ECF No. 175-31)  Thus, MOC contends that based on the

27  _____
          [8] ITW disputes the relevance of the prosecution history to its claim for infringement.  (Reply
28  in Supp. ITW MSJ 4, ECF No. 186)  To the extent that the Court is required to construe the term "only
    a single three-way valve," however, the prosecution history is relevant to the instant motions.  *See*
    *Vitronics*, 90 F.3d at 1582.

1    prosecution history, ITW has explicitly disclaimed a machine that utilizes plural three-way valves.

2           ITW argues, however, that the term "only a single three-way valve" does not require that a

3    machine possess only a single three-way valve.  Rather, the claim language requires "only one

4    three-way valve <u>that does certain things</u>."  (Resp. in Opp'n to MOC '855 & '629 MSJ 21, ECF No.

5    188)  Specifically, ITW contends that there can be only one three-way valve in the ATF Exchange

6    Machine that practices the claimed function—namely, a valve that in its first position directs the

7    transmission fluid into the external circulation loop and that in its second position directs the

8    transmission fluid to waste.  But, according to ITW, this does not limit the machine from having

9    additional three-way valves that do things other than practice the claimed function.

10          Based on the prosecution history and the plain language of the claims, the Court agrees

11   with ITW.  It is true that ITW disclaimed the use of plural three-way valves, but the disclaimer

12   only pertained to the use of multiple valves to "alternatively . . . complete[] or interrupt[]" the

13   external circulation loop.  (Kneafsey Decl. Ex. 25, at 62, ECF No. 175-31)  It did not restrict the

14   number of valves that could be utilized for different purposes.  Thus, the Court finds that the

15   proper construction of the term "only a single three-way valve" is "only a single three-way valve

16   that alternatively completes or interrupts the external circulation loop."

17   (b)  Infringement Analysis

18          Having determined the meaning of the disputed claim term, the Court now turns to the

19   issue of whether MOC's ATF Exchange Machine infringes this limitation.  The Court finds that it

20   does.

21          There is no dispute that MOC's ATF Machine contains two three-way valves and one two-

22   way valve.  (*See* Kneafsey Decl. Ex. H, ECF No. 182-11)  And, the parties agree that Valve #2 (or,

23   the "loop valve") is a three-way valve that is used to alternatively complete or interrupt the

24   external circulation loop.  (*Id.* at 4 (depicting the machine in loop mode with Valve #2 in its

25   first/closed position)); (*Id.* at 1 (depicting the machine in service mode with Valve #2 in its

26   second/open position)).

27          MOC's ATF Exchange Machine utilizes a second three-way valve, however, Valve #1 (or,

28   the "drain valve").  According to MOC, "[t]he two, 3-way valves are both connected to the control

system and work in concert, i.e., open and/or close to communicate fluid from the external

circulation loop to waste." (MOC '855 & '629 MSJ 21, ECF No. 175) Specifically, in service

mode, "[w]hen Valve #2 . . . is in its second position opening the external circulation loop and

directing ATF from the transmission to waste, ATF flows towards and encounters Valve #1 . . . in

its first position." (Resp. in Opp'n to ITW MSJ 8, ECF No. 182) Moreover, "[i]t is imperative

that when three-way Valve #2 is in its second position, three-way Valve #1 must be in its first

position." (*Id.*) Otherwise, "catastrophic failure to the transmission would likely result." (*Id.*)

ITW does not dispute that Valve #1 is used in this manner. But, under this Court's claim

construction, argues ITW, Claim 3 "does <u>not</u> require that <u>only one</u> three way valve can be involved

in communicating ATF to the waste tank." (Resp. in Opp'n to MOC '855 & '629 MSJ 22, ECF

No. 188) The Court agrees. Even if Valve #1 "works in concert" with Valve #2 while in service

mode—such that Valve #1 must be in its first/closed position whenever Valve #2 is in its

second/open position—Valve #1 does not "complete or interrupt" the external circulation loop. It

merely plays a role in communicating ATF to waste when the machine is in service mode; Valve

#2 is the only, single three-way valve that completes or interrupts the external circulation loop.

(*See* (Arnold Decl. Ex. 23, at 103–04, ECF No. 191-23 (deposition transcript of Russell Lindquist

("Lindquist"), indicating that the ATF "doesn't pass through any other three-way valve [other than

Valve #2] in loop mode")); (Arnold Decl. Ex. 29, at 243, 247–48, ECF No. 191-27 (deposition

transcript of Camacho indicating that the ATF does not flow through Valve #1 in loop mode)))[9]

Accordingly, MOC's ATF Exchange Machine, which uses only Valve #2 to alternatively

complete or interrupt the external circulation loop, infringes the disputed claim term as construed.

---

[9] At oral argument, counsel for MOC eventually conceded that Valve #1 does not play a role when the ATF Exchange Machine is in loop mode:

> THE COURT: And so in loop mode, looking at Valve 1, what is the role of Valve 1?
> . . .
> THE COURT: . . . it doesn't have one, does it?
> MR. GROSSMAN: Not in loop mode it doesn't.

(*See* Official Tr. 45, ECF No. 218) Even accepting as true MOC's contention that Valve #1 interrupts the external circulation loop while in top off mode, (*id.* at 46), MOC did not establish that Valve #1 ever completes the external circulation loop. Therefore, Valve #1 does not "alternatively complete or interrupt the external circulation loop," as this Court's claim construction requires.

Thus, the Court **GRANTS** ITW's motion for summary judgment of infringement of Claim 3 of the '629 Patent and **DENIES** MOC's motion for summary adjudication for non-infringement of Claims 2–5 of the '629 Patent.

*(2) Claims 1, 4, 5, 14–15*

Claims 1, 14, and 15 of the '629 Patent contain limitations requiring a motor/pump unit that uses "old ATF from the transmission [to] flow[] via a rotary motor portion of the motor/pump unit to waste . . . and drives a rotary pump portion of said motor/pump unit." '629 Patent col.18 ll.7–13 (Claim 15).  MOC moves for summary adjudication for non-infringement of Claims 1, 14, and 15, as well as Claims 4 and 5—which both also require a motor that uses old ATF to drive the motor and pump gears.  MOC argues that the Court should find that its ATF Exchange Machine is not infringing as a matter of law because it does not allow old ATF to flow through the motor and because it employs an electric motor, not a hydraulic one.[10]  (MOC '855 & '629 MSJ 25–26, ECF No. 175)

As an initial matter, the Court addresses MOC's contention that the '629 Patent requires a motor/pump unit that is energized "solely" by used ATF.  (*Id.* at 22); (*see also id.* at 23 ("[The pump gears] rotate solely from the rotation of [the shafts] which rotate solely from the rotation of [the motor gears]."))  The preferred embodiment of the '629 invention discloses several possible modifications or alterations to the invention, including the following:

> Another alteration which will suggest itself is to provide a torque motor connected in driving relationship to the motor/pump unit . . . .  This torque motor can be arranged to assist but not drive rotation of this motor/pump unit in the direction that it is driven by old ATF being pumped out of a transmission under service.

'629 Patent col.11 ll.24–29.  Accordingly, the '629 Patent covers a device that utilizes a "torque" or electric motor that "assist[s] but [does] not drive rotation of [the] motor/pump unit."  *Id.*  In

---

[10] MOC also conclusively states that its device does not contain a "motor/pump unit." (MOC '855 & '629 MSJ 25, ECF No. 175)  This argument is without merit.  The Court construed a "motor/pump unit" as "a part having a motor and a pump."  (Order on Claim Construction 5, ECF No. 99)  MOC apparently contends that because its ATF Machine "has an electric motor that is attached by a shaft to a dual pump," and that it is "an assembly made-up of a dual pump, coupling and 12-volt DC motor," this somehow takes it outside the Court's construction.  (*Id.*)  But the parties agree that MOC's machine has at least one motor—the electric motor—and dual pumps.  As such, it is a part having a motor and a pump, or a "motor/pump unit."

other words, the motor/pump unit does not need to be energized "solely" by the used ATF; rather, an electric motor may assist.

MOC contends, however, that its device utilizes an electric motor that "drives" the gear pump, which in turn pumps in the new ATF.  (Reply in Supp. MOC '628 & '855 MSJ 20, ECF No. 210 (citing (Kneafsey Decl. Ex. 48, at 31, ECF No. 178-14 (deposition testimony of John Wojcik, ITW's chief engineer))))  Moreover, according to MOC, this electric motor constitutes the "motor" portion of the motor/pump unit, and used ATF does not—indeed cannot—run through this electronic motor.  (MOC '855 & '629 MSJ 25–26, ECF No. 175 ("[T]he electric motor would immediately fail if old ATF were to flow through it.")

ITW concedes that MOC's device utilizes an electric motor, but only to the extent that it "assists" in rotating the motor/pump unit.  (ITW Resp. to Statement of Facts ISO MOC '628 & '855 MSJ ¶ 112, ECF No. 190)  ITW believes there is a disputed issue of fact "regarding the operation of the motor/pump unit in MOC's ATF Exchange Machine."  (Resp. in Opp'n to MOC '855 & '629 MSJ 23, ECF No. 188)  Specifically, ITW contends that MOC's machine is comprised of more than one motor.  One of these motors "is driven (at least in part) by used ATF flowing from the automobile," while the other is an "electric motor – that operates to assist the rotation of the motor/pump unit."  (*Id.* at 24 (citing (Arnold Decl. Ex. 19, at 9–25, ECF No. 191-21 (expert report)))  And according to ITW's expert, the machine is operable with the electric motor unplugged, suggesting that the electric motor is indeed merely "assisting" rather than "driving" the pump rotations.  (Arnold Decl. Ex. 19, at 12, ECF No. 191-12)

Thus, viewing the evidence in ITW's favor, the Court finds that there is a genuine issue of material fact as to the structure and operation of MOC's ATF Exchange Machine such that summary judgment of non-infringement is inappropriate.  As such, the Court **DENIES** MOC's motion for summary adjudication for non-infringement of Claims 1, 4, 5, 14, and 15.

//

//

//

//

1    ***B. Invalidity***

2       MOC moves for summary adjudication for invalidity of the '629 Patent under several

3    bases.[11]

4    *(1) 35 U.S.C. § 102(b) – on-sale bar*

5       MOC asserts that Claims 2 and 3 of the '629 Patent are invalid pursuant to 35 U.S.C.

6    § 102(b).  An invention claimed in a patent is anticipated under § 102(b) if "the invention was

7    patented or described in a printed publication in this or a foreign country or in public use or on sale

8    in this country, more than one year prior to the date of the application for patent in the United

9    States."  35 U.S.C. § 102(b).  As under § 102(a), a determination of invalidity under § 102(b)

10   requires a finding that "each and every limitation is found either expressly or inherently in a single

11   prior art reference."  *Celeritas Techs.*, 150 F.3d at 1361.

12      Whether a patent is invalid pursuant to § 102(b) is a question of law based on underlying

13   questions of fact.  *Minnesota Mining & Mfg. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir.

14   2002).  Moreover, "[b]ecause a patent is presumed to be valid, *see* 35 U.S.C. § 282, the party

15   asserting invalidity has the burden of showing invalidity by clear and convincing evidence."  *WMS*

16   *Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999); *see also Central*

17   *Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347, 1357–58

18   (Fed. Cir. 2007).

19   (a) Prior Art

20      Here, MOC bases its anticipation defense on a single prior art reference, Wynn's

21   TranServe machine.  Over time, there have been several versions of the TranServe machine,

22   TranServe I, TranServe II, TranServe II+, and TranServe III.  The TranServe I was first sold in

23   December 1995.  (Kneafsey Decl. Ex. 3, ECF No. 175-9 (TranServe I sales records))  In light of

24   the TranServe I's poor market performance, (Arnold Decl. Ex. 39, at 44, ECF No. 191-32

25   (deposition testimony of Gerald Miles)), Wynn began redesigning the machine in mid-1996, and

26

27   ───────────────

28   [11] In addition to the bases discussed in this section, MOC asserts invalidity of the '629 Patent
     pursuant to 35 U.S.C. § 102(f).  Because the same analysis applies for both the '629 and '855 Patents,
     the Court reserves the § 102(f) analysis for the '855 Patent section.  The same goes for MOC's motion
     for summary adjudication under the doctrine of equitable estoppel, which also pertains to both patents.

1  began selling the TranServe II in mid-1997, (*Id.* Ex. 41, ECF No. 191-34 (TranServe II sales

2  records)).

3       The TranServe I utilized a used fluid sensor that helped to control the system.  (*Id.* Ex. 38,

4  at 69–73, ECF No. 191-31 (deposition testimony of Mark Hischier))  If the used fluid tank was

5  full, the used fluid sensor would prevent the control system from activating the three-way valve to

6  flow ATF from the vehicle to waste, even if the new fluid tank sensor indicated that there was an

7  adequate supply of new fluid.  (*Id.* at 70–72)  Thus, in the TranServe I, both the used fluid tank

8  sensor and the new fluid tank sensor had to be engaged in order for the control system to operate

9  in exchange mode—i.e., to exchange new and old ATF.  Conversely, the TranServe II was

10 designed to utilize only one sensor, and there was no sensor in the used fluid tank on that device.

11 (*Id.* at 72)

12 (b)  Analysis

13      The '629 Patent was filed on March 13, 1997.  '629 Patent, at [22].  Thus, MOC contends

14 that because the TranServe was "sold more than one year prior to the date of the application," 35

15 U.S.C. § 102(b), and because it contained each and every element of Claims 2 and 3, those claims

16 are invalid under § 102(b).  (MOC '855 & '629 MSJ 8–9, ECF No. 175); *see also* (Kneafsey Decl.

17 Ex. 15, ECF No. 175-21 (photographs of the TranServe that correspond to the limitations of Claim

18 2)); (Kneafsey Decl. Ex. 16, ECF No. 175-22 (photographs of the TranServe that correspond to the

19 limitations of Claim 3))

20      ITW contends that the TranServe I device did not meet the following claim limitations:

21 (1) "providing a control system allowing actuation of said actuating device only when said sensor

22 indicates an adequate supply of new ATF," '629 Patent col.12 ll.18–20 (Claim 2); and (2) "a

23 control system interconnecting said sensor and said actuator to allow actuation of said actuator to

24 place said only a single three-way valve in said second position only while said sensor indicates an

25 adequate supply of new ATF," '629 Patent col.12 ll.50–55 (Claim 3).[12]  (Resp. in Opp'n to MOC

26 

---

27      [12] ITW also conclusively states without any supporting argument that summary judgment

28 should be denied because MOC has failed to carry its burden to establish invalidity by clear and
convincing evidence.  Based on a review of the evidence that MOC points to in support of its motion,
however, the Court finds that MOC has sufficiently carried this burden.

'855 & '629 MSJ 29, ECF No. 188)  This is based on the fact that, unlike the claimed invention, the TranServe I utilized two sensors: one in the new fluid tank and another in the used fluid tank. Thus, even if, as the claim limitations require, the new fluid tank sensor indicated an adequate supply of new ATF, the control system in the TranServe I would not allow the three-way valve to move into its second position unless the used fluid tank sensor indicated that the waste tank was not full.  (*Id.*)

MOC persuasively argues, however, that "it is irrelevant that the TranServe contains a sensor in the used fluid tank."  (Reply in Supp. MOC '855 & '629 MSJ 3, ECF No. 206)  "The only issue is whether (1) TranServe I had a sensor in the new fluid tank, and (2) whether TranServe I had a control system which would actuate the three-way valve only when the new fluid tank sensor indicated an adequate supply of new fluid."  (*Id.*)  Based on a review of the claim language, the Court must agree with MOC's analysis.

Claims 2 and 3 disclose a sensor for indicating when the new fluid container holds an adequate supply of new ATF, but are silent as to the existence or function of any sensor on the used fluid tank.  Unless the new fluid tank sensor indicates there is an adequate supply of new ATF, Claims 2 and 3 require that the control system prevents the device from switching into exchange mode.  The sensor on the TranServe I operates exactly as disclosed in the '629 Patent, irrespective of its second, used fluid tank sensor.  Specifically, the TranServe I has a sensor on the new fluid tank that will not allow the control system of the machine to switch into exchange mode unless the sensor indicates there is an adequate supply of new ATF.  That the TranServe I has an additional sensor on the used fluid tank that also prevents the machine from switching into exchange mode is of no moment.

Thus, because there is no genuine issue that the TranServe I anticipated each and every claim limitation of Claims 2 and 3 of the '629 Patent, the Court **GRANTS** MOC's motion for summary adjudication for invalidity of Claims 2 and 3 of the '629 Patent pursuant to § 102(b).

//

//

//

*(3)  35 U.S.C. § 103 – obviousness*

MOC additionally contends that Claims 1, 4, 5, 14, and 15 of the '629 Patent are invalid as obvious under 35 U.S.C. § 103.  A patent is invalid for obviousness if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103.  Whether the claimed subject matter would have been obvious to an ordinarily skilled artisan at the time of the invention "is a question of law based on underlying questions of fact."  *Green Edge Enters.*, 620 F.3d at 1298.  The underlying factual inquiries include: (1) "the scope and content of the prior art"; (2) "differences between the prior art and the claims at issue"; (3) "the level of ordinary skill in the pertinent art"; and (4) relevant secondary considerations, including "commercial success, long felt but unresolved needs, [and] failure of others."  *KSR Int'l Co. v. Telefax, Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966)).  Summary judgment of obviousness is appropriate if "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in dispute, and the obviousness of the claim is apparent in light of these factors.  *Id.* at 427.

"The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."  *Id.* at 416.  If an ordinarily skilled artisan can implement a predictable variation of a work available in the same field of endeavor, § 103 likely bars its patentability.  *Id.* at 417.  However, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art."  *Id.* at 418.

Determining whether a patent claiming a combination of known elements would have been obvious

> usually entails considering the "interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue."

*Trimed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1341 (Fed. Cir. 2010) (quoting *KSR*, 550 U.S. at 418).  Identifying a motivation to combine can be important because "inventions in most, if not all,

instances rely upon building blocks since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *KSR*, 550 U.S. at 418–19. "[A]ny need known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420.

Additionally, a patent's subject matter can be proved obvious "by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims." *Id.* at 419–20; *see also Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2010) (holding that obviousness analysis "may include recourse to logic, judgment, and common sense available to a person of ordinary skill that do not necessarily require explication in any reference or expert opinion"). "When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense." *KSR*, 550 U.S. at 420.

Here, the scope and content of the prior art and the level of ordinary skill in the pertinent art are not in dispute. (*See* Resp. in Opp'n to MOC '855 & '629 MSJ 25, ECF No. 188) Thus, the only factual issues in dispute are (1) the differences between the prior art and the '629 Patent, and (2) the existence and significance of pertinent secondary considerations.

Describing this as a "textbook case of invalidity," (MOC '855 & '629 MSJ 33, ECF No. 175), MOC contends that Claims 1, 4, 5, 14, and 15 of the '629 Patent are invalid as obvious because the patent merely combined prior art elements to "yield predictable results." *KSR*, 55 U.S. at 416. According to MOC, the invention of the '629 Patent simply combines a well-known dual hydraulic pump unit with the already-existing TranServe I machine to achieve predictable results.[13] (MOC '855 & '629 MSJ 29–30, ECF No. 175)

---

[13] What is obvious to one skilled in the pertinent art may not be so obvious to one who is not so skilled. Thus, it may be helpful to spell out what that combination achieved: The TranServe I machine utilized a single pump to pump new ATF into the transmission line. That pump was driven by an electric motor. Because new ATF should ideally be pumped in at approximately the same rate as old ATF is pumped out so as to avoid dry running the engine, there were two control knobs to manually control the rate at which the new and old ATF flowed.

1    ITW contends, however that differences between the prior art and the claims of the '629

2    Patent preclude summary judgment of invalidity on the ground of obviousness.  First, ITW points

3    out several differences between the prior art TranServe I machine and the machine claimed in the

4    '629 Patent.  The relevant differences include that the TranServe I required manual operation to

5    ensure that the flow of old and new ATF matched so that the engine did not run dry, that it did not

6    have a double pump or motor/pump unit to ensure near equal displacement of new and used ATF,

7    and that it utilized an electric motor to drive a pump on the new fluid side.  (Resp. in Opp'n to

8    MOC '855 & '629 MSJ 25–26, ECF No. 188)  The Court finds these apparent differences

9    unpersuasive, however, as it was merely the combination of the prior art references that created

10   these differences.

11   Second, ITW contends that the prior art motor/pump unit patents differ from the unit

12   claimed by the '629 Patent:

13   The motor/pump unit disclosed in the '629 patent is a positive displacement
     motor/pump unit in the external fluid circulation loop, where the loop is opened
14   and old ATF from the transmission flows via a motor portion of the motor/pump
     unit to waste by reason of pressure provided by said internal transmission pump
15   and drives a pump portion of the motor/pump.  None of the alleged motor/pump
     patents cited by MOC disclosed this type of unique motor/pump unit used in this
16   unique fashion.

17   (Resp. in Opp'n to MOC '855 & '629 MSJ 26, ECF No. 188)  ITW does not cite to any of the

18   prior art motor/pump patents or devices, nor any other authority, to support this contention,

19   however.  The Court's own review of the prior art patents cited by MOC convince the Court that

20   there is no appreciable difference between the prior art motor/pump units and the unit disclosed in

21   the '629 Patent.

22   For example, Patent No. 4,511,378 ("the '378 Patent") claims an invention including "a

23   positive displacement gear motor, a positive displacement gear pump, and a drive connecting the

24   motor to the pump with the gear motor."  '378 Patent, at [57].  The device is described as "a gear-

25   _____

26   The prior art rotary motor-pump technology consists of two sets of gears that are connected
     by a belt or shaft.  Liquid flows through the motor gears, causing them to turn.  When the motor gears
     turn, this engages the shaft, which causes the pump gears to simultaneously turn.
27   Thus, the combination of these two devices results in a machine that flows used ATF through
     the motor gears, causing them to turn.  When the motor gears turn, this engages the shaft, which
28   causes the pump gears to simultaneously turn, thus pumping in an equal volume of ATF as is pumped
     out.

type pump . . . , gear-type motor . . . and means providing a driving connection between pump . . . and motor . . . .  Both pump . . . and motor . . . are positive displacement devices."  '378 Patent col.2 ll.67–68, col.3 ll.1–3.  Additionally, U.S. Patent No. 4,295,802 ("the '802 Patent") describes the invention as including

> a pump and motor assembly . . . in which the motor is driven by the flow of a liquid fuel from source means to the fuel tank being filled whereby the starting and stopping of the vapor pump will coincide with starting and stopping of the flow of such fuel without external or other controls being required.

'802 Patent col.1 ll.55–61.  The Court sees no appreciable difference between the motor/pump unit disclosed in these and the other prior art patents cited to by MOC,[14] and that utilized in the '629 Patent.  *See* '629 Patent col.12 ll.59–67.

MOC further identifies a motivation to combine the two prior art references in this way, namely, that "[t]wo years following the TranServe's introduction, Wynn's customers requested the design be changed to make [the] machine easier to use."  (*Id.* at 29 (citing (Kneafsey Decl. Ex. 24, at 20–23, ECF No. 175-30); (*id.* Ex. 28, ECF No. 178-6 ("A need has been developed over the past 2–3 years to market a cost effective and simple to operate machine."))))  More specifically, and as explicitly identified in the background of the '629 Patent, a known problem with the prior art ATF exchange machines was that they did not effectively ensure the equal replacement of new ATF as the old ATF was drained in order to prevent harmful dry running of the engine without requiring manual assistance, or at least that the service technician be constantly monitoring the machine. '629 Patent cols.1–4.

The Court finds that the prior art clearly and convincingly discloses "a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the" '629 Patent does.  *KSR*, 550 U.S. at 418.  The prior art motor/pump unit patents clearly teach that fluid flowing through motor gears connected via a shaft to pump gears may drive said pump

---

[14] *See also, e.g.*, 3,067,590 Patent col.2 ll.18–28 (disclosing a motor/pump unit whereby liquid is introduced into the motor side "causing rotation of the gears . . . .  One of the motor gears is mounted upon a drive shaft which is directly connected to one of the pump gears so as to drive the pump at a one-to-one ratio"); 5,012,837 Patent, at [57] ("A ratio device for dispensing first and second liquids in a preselected ratio, which comprises a housing assembly having two gear pumps interconnected for concurrent operation.  One of the gear pumps is configured also to act as a liquid powered motor operative in response to the pressure and flow of the first liquid."); 5,150,742 Patent.

gears at a one-to-one ratio.  It is simply a matter of common sense that the motor/pump units used in the prior art patents could be combined with the prior art ATF exchange machines in order to address the known difficulty of ensuring equal exchange of old and new ATF.  *See KSR*, 550 U.S. at 421.  ("When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.")

ITW further argues that secondary indicia of nonobviousness, "including copying, commercial success as a result of the merits of the invention, and that the invention satisfied a long-felt need," support a finding of nonobviousness.  (Resp. in Opp'n to MOC '855 & '629 MSJ 26, ECF No. 188)  Even accepting as true ITW's assertions on these secondary considerations, they do not save ITW from summary judgment here since such secondary considerations "simply cannot overcome a strong prima facie case of obviousness."  *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010) (citing, *inter alia*, *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007)).

Accordingly, the Court finds that the asserted claims of the '629 Patent are invalid pursuant to 35 U.S.C. § 103, and **GRANTS** MOC's motion for invalidity of Claims 1, 4, 5, 14, and 15.[15]

### 3. '855 Patent

#### A. Direct Infringement

ITW moves for summary judgement that MOC directly infringes Claims 14–17 of the '855 Patent.  MOC opposes only on the basis that it cannot be liable for infringement of the '855 Patent because the patent is invalid.  (Resp. in Opp'n to ITW MSJ 10, ECF No. 182)  Indeed, MOC concedes that its ATF Exchange Machine and adapters infringe on the '855 Patent.  ITW's expert also conducted a thorough inspection of MOC's accused devices, concluding that MOC literally infringes each of the asserted claim limitations.  (Arnold Decl. Ex. 19, at 10–13, 26–34, ECF No. 191-21); *see also* (*Id.* Ex. 23, at 103–04, 160–61, 251–52, ECF No. 191-23); (*Id.* Ex. 29, at 230,

---

[15] Because the Court grants MOC's motions for invalidity of Claim 3 pursuant to § 102(b) and Claims 14 and 15 pursuant to § 103, it does not reach MOC's motion for invalidity of those claims pursuant to § 112's best mode requirement.  (MOC '855 & '629 MSJ 17–18, ECF No. 175)

ECF No. 191-27)

In light of MOC's concession and ITW's proffered evidence, the Court finds that ITW has met its burden of demonstrating that MOC's ATF Exchange Machine and adapters are infringing. *See, e.g.*, *Oki Am., Inc. v. Advanced Micro Devices, Inc.*, No. 04-3171, 2006 U.S. Dist. LEXIS, at *26 (N.D. Cal. Nov. 13, 2006).   Accordingly, the Court **GRANTS** ITW's motion for summary judgment of infringement of Claims 14–17 of the '855 Patent.

***B. Invalidity***

MOC also moves for summary adjudication for invalidity of the '855 Patent under several bases.

*(1) 35 U.S.C. § 102(b) – on-sale bar*

MOC asserts that Claims 1, 3–5, and 14–17 of the '855 Patent are invalid pursuant to 35 U.S.C. § 102(b).

(a) Prior Art

MOC again raises as the prior art reference Wynn's TranServe machine, described above. Relevant here, to prepare the TranServe I for operation, a pair of TranServe adapters were attached to the vehicle, and an intermediate hose was attached to the adapter via a worm clamp.  (Arnold Decl. Ex. 23, at 184–85, ECF No. 191-23); (*Id.* Ex. 37, at 27, ECF No. 191-30 (deposition testimony of Patrick Dixon ("Dixon"))); (*Id.* Ex. 38, at 85–86, ECF No. 191-31)  A worm clamp is "a round clamp with a gear that must be manually tightened, making use of the machine cumbersome."  (Resp. in Opp'n to MOC '855 & '629 MSJ 28, ECF No. 188); (Arnold Decl. Ex. 23, at 185, ECF No. 191-23)

(b) Analysis

The '855 Patent was filed on June 2, 1998. '855 Patent, at [22].  Thus, MOC contends that because the TranServe was "sold more than one year prior to the date of the application," 35 U.S.C. § 102(b), and because it contained each and every element of Claims 1, 3–5, and 14–17, those claims are invalid under § 102(b).  (MOC '855 & '629 MSJ 6–7, ECF No. 175); *see also* (Kneafsey Decl. Ex. 5, ECF No. 175-11 (photographs of the TranServe that correspond to the limitations of Claim 5)); (*Id.* Ex. 9, ECF No. 175-15 (photographs of the TranServe that

1  correspond to the limitations of Claim 1)); (*Id.* Ex. 54, ECF No. 176-24 (claim chart summarizing

2  Claims 1, 3, and 4)); (*Id.* Ex. 55, ECF No. 176-25 (claim chart summarizing Claims 14–17))

3       Other than a conclusive statement that MOC has not carried its burden to establish

4  invalidity by clear and convincing evidence, ITW's sole contention for why the TranServe I did

5  not anticipate the asserted claims of the '855 Patent is because unlike the claimed invention, "the

6  original TranServe I did not use quick disconnect couplings to connect the adapters to the

7  intermediate hoses; rather it used a worm gear clamp." (Resp. in Opp'n to MOC '855 & '629 MSJ

8  28, ECF No. 188)  In support, ITW points to testimony that establishes that at some point, the

9  TranServe I utilized clamps rather than the quick disconnect couplings disclosed in the '855

10 Patent.  (Arnold Decl. Ex. 23, at 184–85, ECF No. 191-23); (*Id.* Ex. 37, at 26–27, ECF No. 191-

11 30); (*Id.* Ex. 38, at 85–86, ECF No. 191-31)  And, ITW establishes that in mid-1998, it introduced

12 a "New Transmission Adapter Kit" with improved quick-disconnect couplings.  (*Id.* Ex. 43, ECF

13 No. 191-36 (Wynn's bulletin))  But ITW leaves out several steps along the way.

14       MOC does not contest ITW's characterization of the "original TranServe I."  But, MOC

15 argues that prior to one year before the patent application was filed, "Wynn's began offering for

16 sale to its customers the TranServe with quick-disconnect couplers instead of the clamp-on

17 couplers."  (Reply in Supp. MOC '855 & '629 MSJ 1, ECF No. 206)  Indeed, as early as January

18 27, 1997, Wynn's had "initiate[d] a design change for the TranServe hose clamp."  (Arnold Decl.

19 Ex. 37, at 25, ECF No. 191-30)  And, by March 21, 1997, Wynn's announced that it had

20 "developed a set of quick disconnect adaptors for the . . . TranServe machine [to] replace

21 [the] . . . clamp-on adapters."  (Kneafsey Decl. Ex. 14, ECF No. 178-14 (Wynn's bulletin))  The

22 General Manager of Wynn's, Miles, indicated that at the time of the announcement, the quick

23 disconnect adapters were "produced, in inventory, and ready for sale."  (*Id.* Ex. 10, at 28, ECF No.

24 175-16)

25       In light of this uncontested evidence, the Court finds that ITW has failed to establish a

26 genuine issue that the TranServe device did not anticipate the asserted claims of the '855 Patent.

27 Accordingly, the Court **GRANTS** MOC's motion for summary adjudication for invalidity of

28

1    Claims 1, 3–5, and 14–17 of the '629 Patent pursuant to § 102(b).[16]

2    *(3)  35 U.S.C. § 102(f) – inventorship*

3        MOC moves for summary adjudication of invalidity of the '629 and '855 Patents  pursuant

4    to 35 U.S.C. § 102(f) for failure to name Lindquist as an inventor.  Because a patent is presumed

5    valid under 35 U.S.C. § 282, "there follows a presumption that the named inventors on a patent are

6    the true and only inventors."  *Trovan, Ltd. v. Sokymat Sa*, 299 F.3d 1292, 1301 (Fed. Cir. 2002).

7    Nevertheless, § 102(f) "makes the naming of the correct inventor or inventors a condition of

8    patentability; failure to name them renders a patent invalid."  *Pannu v. Iolab Corp.*, 155 F.3d 1344,

9    1349–50 (Fed. Cir. 1998).

10        In deciding the issue of invalidity under § 102(f) due to nonjoinder, "a district court should

11   first determine whether there exists clear and convincing proof that the alleged unnamed inventor

12   was in fact a co-inventor."  *Id.* at 1350.  "If the court finds that a co-inventor was not omitted (as,

13   for example, when it determines that the omitted person was not an inventor), the patent is not

14   rendered invalid for that reason.  If the court finds that a co-inventor was omitted, it must find the

15   patent to be invalid under § 102(f)."  *Nichols Inst. Diagnostics, Inc. v. Scantibodies Clinical Lab.,*

16   *Inc.*, 218 F. Supp. 2d 1243, 1247 (S.D. Cal. 2002).

17        "[I]nventorship is determined on a claim-by-claim basis."  *Trovan*, 299 F.3d at 1301.  In

18   order to qualify as a "joint inventor," one must

19           (1) contribute in some significant manner to the conception or reduction to
             practice of the invention, (2) make a contribution to the claimed invention that is
20           not insignificant in quality, when that contribution is measured against the
             dimension of the full invention, and (3) do more than merely explain to the real
21           inventors well-known concepts and/or the current state of the art.

22   *Pannu*, 155 F.3d at 1351.  To prove co-inventorship, there must be corroborating evidence of a co-

23   inventor's contributions toward the conception of the invention.  *Checkpoint Sys., Inc. v. All-Tag*

24   *Security, S.A.*, 412 F.3d 1331, 1339 (Fed. Cir. 2005).  "Physical, documentary, or circumstantial

25   evidence, or reliable testimony from individuals other than the alleged inventor or an interested

26   party, may corroborate."  *Id.*

27   _____

28       [16]  Because the Court grants MOC's motion for invalidity of Claims 1, 5, and 14 pursuant to
     § 102(b), it does not reach MOC's motion for invalidity of those claims pursuant to § 112's best mode
     requirement.  (MOC '855 & '629 MSJ 14–17, ECF No. 175)

1        MOC contends that Lindquist, a Wynn's employee, was involved in the design and

2   development of the ATF exchange machine and adapters claimed in the '629 and '855 Patents.  To

3   establish this, MOC points to testimony from Lindquist himself, (Kneafsey Decl. Ex. 8, at 19,

4   27–28, 57–60, 62–63, 221–22, 255–56, 259–61, 264–71, 276–93, ECF No. 175-14); testimony

5   from co-inventors Camacho, (id. Ex. 19, at 378–79, 392–93, 396, 418–19, ECF No. 175-25), and

6   Rounds, (id. Ex. 24, at 9, ECF No 175-30); and testimony from other Wynn's executives, (id. Ex.

7   10, at 14–17, ECF No. 175-16 (deposition transcript of Gerald Miles, Wynn's General Manager));

8   (id. Ex. 20, at 17, 21, 28, ECF No. 175-26 (deposition transcript of James Baylor)).  Taken

9   together and further corroborated by several contemporaneous documents, (id. Ex. 17, ECF No.

10  175-23); (id. Ex. 21, ECF No. 175-27); (id. Ex. 22, ECF No. 175-28), this testimony suggests that

11  Lindquist—at a minimum—made some contribution to the design and development of the

12  patented inventions.

13       Even in light of this evidence, however, the Court must find that there is a genuine issue of

14  material fact on the question of whether Lindquist was a co-inventor on the '629 and '855 Patents.

15  In opposition to MOC's proffered evidence, ITW proffers the original declarations filed before the

16  PTO.  (Arnold Decl. Ex. 48, ECF No. 191-41 (Declaration and Power of Attorney for Patent

17  Application '629 signed by Dixon, Todd Rounds ("Rounds"), and Camacho)); (Id. Ex. 49, ECF

18  No. 191-42 (Declaration and Power of Attorney for Patent Application '855 signed by Camacho,

19  Dale Johnson, and Mark Sasaki))  Those signed declarations recite that the signing parties are the

20  only joint inventors on the '629 and '855 Patents; Lindquist is not listed as a joint inventor.

21  Subsequently, however, Camacho and Rounds testified that Lindquist too had a role in the design

22  of the patented invention.  (Kneafsey Decl. Ex. 19, at 392–93, ECF No. 175-25); (Id. Ex. 24, at 9,

23  ECF No. 175-30 (deposition transcript of Rounds))  "Thus, there is flatly contradictory evidence

24  relating to the matter critical for determining whether the ['629 and '855 Patents are] invalid under

25  35 U.S.C. § 102(f)."  Checkpoint, 412 F.3d at 1338 (holding that the original PTO declarations

26  create a genuine issue of material fact).

27  //

28  //

1    Accordingly, the Court finds there is a genuine issue as to whether Lindquist was a co-

2    inventor on the '629 and '855 Patents, precluding a grant of summary adjudication for invalidity.[17]

3    **C.  Equitable Estoppel**

4    "Equitable estoppel may be imposed in a patent case when a patentee induces another party

5    to believe that it will not sue that party for infringement." *Forest Labs., Inc. v. Abbott Labs.*, 339

6    F.3d 1324, 1329 (Fed. Cir. 2003)  Unlike the defense of laches—which bars relief only with

7    respect to pre-suit damages—if an accused infringer can establish the defense of equitable

8    estoppel, the entire suit may be barred.  *See Aukerman*, 960 F.2d at 1041.

9    For the defense to apply, the accused infringer must establish three elements.  First, "[t]he

10   patentee, through misleading conduct, le[d] the alleged infringer to reasonably infer that the

11   patentee d[id] not intend to enforce its patent against the alleged infringer.  'Conduct' may include

12   specific statements, action, inaction, or silence where there was an obligation to speak." *Id.*

13   Second, "[t]he alleged infringer relie[d] on that conduct." *Id.*  Third, "[d]ue to its reliance, the

14   alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim."

15   *Id.*

16   Here, the Court finds that there is a genuine issue as to the first element of MOC's estoppel

17   defense, and therefore summary judgment is inappropriate.  The parties dispute the relevance of

18   ITW's silence or inaction.  "[S]ilence alone will not create an estoppel unless there was a clear

19   duty to speak . . . or somehow the patentee's continued silence reenforce[d] the defendant's

20   inference from the plaintiff's known acquiescence that the defendant will be unmolested."

21   *Aukerman*, 960 F.2d at 1043–44.  Indeed, a patentee's "inaction must be combined with other facts

22   respecting the relationship or contacts between the parties to give rise to the necessary inference

23   that the claim against the defendant is abandoned." *Id.* at 1043.

24   MOC points to evidence in the record that individuals at ITW not only knew of MOC's

25   accused devices, but that they were also aware of the possibility that those devices infringed on the

26

27    [17] The parties also dispute the import of 35 U.S.C. § 256, which allows a patentee to save a
28 patent from invalidity for incorrect inventorship.  Because the Court finds a genuine issue as to inventorship, however, it need not consider whether the patent may be corrected under § 256.  *See Checkpoint*, 412 F.3d at 1340.

1    '629 and '855 Patents.  Specifically, MOC established that ITW's technical manager, Scott,

2    "monitored at trade shows companies . . . considered to be [ITW's] direct competitors," including

3    MOC.  (Kneafsey Decl. Ex. 27, at 118, ECF No. 175-33)  And, MOC points to a March 26, 2003,

4    email exchange that indicates that ITW believed that MOC's devices might be infringing on its

5    patents.  (Kneafsey Decl. Ex. 44, ECF No. 178-11)

6         But what MOC has not shown is telling: ITW at no point communicated to MOC that it

7    thought that MOC was infringing its devices.  This is not a case where the patentee accused the

8    defendant of infringement, and then failed to follow up.  *Scholle Corp. v. Blackhawk Molding Co.*,

9    133 F.3d 1469, 1472 (Fed. Cir. 1998); *see also Auckerman*, 960 F.2d at 1043 ("In the most

10   common situation, the patentee specifically objects to the activities currently asserted as

11   infringement in the suit then does not follow up for years.").  In such a situation, the patentee's

12   silence may indeed "lull[] the infringer into a sense of security."  *Auckerman*, 960 F.2d at 1043.

13        Moreover, "[a]s with laches, egregious conduct must be considered as part of the equitable

14   estoppel determination."  *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 776 (Fed.

15   Cir. 1995).  And just as the Court determined with regard to MOC's motion for summary

16   judgment under the doctrine of laches, there is a genuine issue as to whether MOC engaged in

17   "egregious conduct" by intentionally copying the patented invention such that the equitable

18   defense of estoppel cannot apply.

19        Accordingly, for the above reasons, the Court **DENIES** MOC's motion for summary

20   adjudication for no liability under the doctrine of equitable estoppel.

21                                        **CONCLUSION**

22        For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART**

23   ITW's motion for summary judgment of infringement.  ITW's motion is **DENIED** as to the '638

24   Patent and is **GRANTED** as to the '629 and '855 Patents.  Additionally, the Court **DENIES**

25   MOC's motion for summary adjudication pertaining to the '638 Patent in its entirety, and

26   **GRANTS IN PART AND DENIES IN PART** MOC's motion for summary adjudication

27   pertaining to the '629 and '855 Patents.  MOC's motions for non-infringement of the '629 Patent,

28   invalidity of the '629 and '855 Patents pursuant to § 102(f), and no liability under the doctrine of

equitable estoppel are **DENIED**.  MOC's motions for invalidity of the '629 and '855 Patents pursuant to § 102(b) and invalidity of the '629 Patent pursuant to § 103 are **GRANTED**.

      **IT IS SO ORDERED**.

DATED:  March 6, 2012

                              *Janis L. Sammartino*
                              Honorable Janis L. Sammartino
                              United States District Judge

09cv1887