UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ILLINOIS TOOL WORKS, INC. dba WYNN'S, a Delaware Corp., <br><br> Plaintiff, <br><br> vs. <br><br> MOC PRODUCTS COMPANY, INC., a California Corp., <br><br> Defendant. | CASE NO. 09CV1887 JLS (MDD) <br><br> **ORDER ON MOTIONS IN LIMINE** <br><br> (ECF Nos. 247, 250–57) |

    Presently before the Court are nine motions in limine: five filed by Plaintiff Illinois Tool Works, Inc. d/b/a Wynn's ("Plaintiff" or "ITW") and four filed by Defendant MOC Products Company, Inc. ("Defendant" or "MOC"). A hearing on the motions was held on August 9, 2012. Having considered the parties' arguments and the law the Court rules as follows.

**1. Plaintiff's MiL No. 1: Motion to Preclude MOC from Referencing Certain Alleged Acceptable Non-Infringing Substitutes to the Patented Inventions (ECF No. 253)**

    The Court **GRANTS IN PART AND DENIES IN PART** ITW's motion to preclude reference to certain alleged acceptable noninfringing substitutes. MOC does not oppose the motion to the extent it seeks to preclude expert testimony from David Weiner, (Opp'n to Pl.'s MiL No. 1, at 8, ECF No. 261), and the motion is therefore **GRANTED** on this basis. As to the assertion of various acceptable noninfringing substitutes that MOC purportedly failed to list in its interrogatory responses, however, the Court **DENIES** the motion. Upon consideration, the Court agrees that, taken together, MOC's interrogatories adequately disclose other acceptable noninfringing substitutes not listed in interrogatory 11, or those devices are at least so sufficiently

disclosed that the harsh Rule 37(c) sanction of exclusion is not warranted. To the extent that MOC seeks to introduce other products that are not arguably referenced in the other interrogatory responses, the Court **DENIES** the motion **WITHOUT PREJUDICE** to any objections raised at the time of trial.

**2. Plaintiff's MiL No. 2: Motion to Preclude MOC from Referencing Alleged Motive of ITW in Bringing Lawsuit (ECF No. 254)**

ITW seeks to preclude MOC from "offering argument or posing questions regarding [ITW's] alleged motive in bringing the instant lawsuit." (Pl.'s MiL No. 2, at 3, ECF No. 254) In various other Court filings, MOC has insinuated that ITW brought this action in retaliation for MOC's earlier patent infringement lawsuit against ITW, *EBS Automotive Services & MOC Products Co., Inc. v. Illinois Tool Works Inc., dba Wynn's*, Case No. 09-CV-996 JLS (MDD) [hereinafter "*EBS*"]. ITW contends that evidence of this alleged motive in bringing suit is irrelevant, misleading, and prejudicial. (*Id.*)

MOC opposes, arguing that ITW's motive in bringing this lawsuit is relevant to MOC's defense of laches based on ITW's allegedly unreasonable and unjustified delay in asserting its patent rights against MOC. (Opp'n to Pl.'s MiL No. 2, at 2, ECF No. 262) According to MOC, "[i]n evaluating whether the delay was reasonable the jury should be permitted to consider the reason ITW remained silent for eight years and the reason it finally changed its position and asserted infringement." (*Id.*)

The Court agrees that evidence of ITW's motive in bringing this suit carries with it a significant amount of prejudice, and moreover will unnecessarily complicate matters by bringing in evidence of the *EBS* case that is otherwise not pertinent to this action. However, if the evidence is relevant, it will be admissible so long as "its probative value is [not] substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403.

Laches is a defense to patent infringement where the defendant proves by a preponderance of the evidence that (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim

against the defendant"; and (2) "the delay operated to the prejudice or injury of the defendant." *A.C. Auckerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc). Here, the parties are in agreement that a presumption of laches arose because ITW delayed more than six years in filing suit. *Id.* at 1035–36. In that case, ITW bears the burden to "rebut the presumption of laches 'by offering evidence to show an excuse for the delay or that the delay was reasonable' or by offering evidence 'sufficient to place the matters of [evidentiary] prejudice and economic prejudice genuinely in issue.'" *Serdarevic v. Advanced med. Optics, Inc.*, 532 F.3d 1352, 1358 (Fed. Cir. 2008) (quoting *Auckerman*, 960 F.2d at 1038). But ITW does not plan to attempt to rebut the presumption of laches. Instead, ITW will seek to "preclude application of the laches defense with proof that [MOC] was itself guilty of misdeeds toward the patentee." *Auckerman*, 960 F.2d at 1038.

Given ITW's position, prior to oral argument the Court was inclined to grant the motion in limine, because the Court failed to see how ITW's motive in bringing suit would be relevant to the action. Even assuming ITW's delay was unreasonable and inexcusable, ITW asserts that the laches defense should not apply because of MOC's conduct in intentionally copying ITW's patented product and method. Under ITW's theory of the case, evidence pertaining to ITW's delay (and the reason for that delay) would seem unnecessary,[1] and any probative value of evidence of ITW's motive would therefore be outweighed by its prejudicial impact.

This subject was discussed at length during the hearing, and it is at the heart of much of the parties' disputes pertaining to the jury instructions. Indeed, the Court Ordered supplemental briefing on the laches issue in order to work toward a resolution of the disputed jury instructions and toward a course of action for determining the equitable issues in this case. Because the Court's decision on these issues may bear on the admissibility of this evidence, the Court **RESERVES RULING** on this motion in limine until a later date.

---

[1] The parties dispute this point, and it is related to the issues to be briefed in the parties' supplemental briefing. According to MOC, even if ITW stipulates to the presumption of laches, evidence of ITW's motive, size, and status is relevant to the Court's determination of the laches issue because the Court must look at the totality of the circumstances. According to ITW, such evidence is not relevant, because the focus should be on MOC's misdeeds, and ITW's actions drop out of the equation. At this time, the Court reserves judgment on which view is correct, and encourages the parties to provide support for their positions in their supplemental briefs.

**3. Plaintiff's MiL No. 3: Motion to Preclude MOC from Referencing ITW's Size or MOC's Status as a Family Business (ECF No. 255)**

ITW next seeks to preclude MOC from referencing ITW's size or, relatedly, MOC's status as a family-run business because such references are irrelevant, prejudicial, and misleading. (Pl.'s MiL No. 3, ECF No. 255)

MOC asserts that ITW's size and market dominance are relevant to its defense of laches because "MOC will need to introduce evidence that ITW likely had actual knowledge, or at the very least, had constructive knowledge of MOC's accused device. Relevant to that will be ITW's duty and ability to investigate potential infringement." (*Id.* at 4) And, evidence of ITW's size and market dominance would tend to suggest that it had the ability to monitor the market for infringement. (*See id.* at 5) As above, the Court **RESERVES RULING** on this motion in limine until after the Court makes a determination as to the jury instructions and equitable defenses.

Because ITW seeks to preclude the defense of laches by proving that MOC was guilty of misdeeds, evidence of MOC's size and status as a family-owned business[2] would be relevant to ITW's charge that MOC knowingly copied ITW's patented product and method. This is because "MOC's size and status as a family-run business . . . is relevant to whether MOC had the capacity to know it was infringing." (*Id.* at 7) Moreover, as MOC points out, this evidence is also more generally relevant to rebut ITW's assertion that MOC willfully infringed the patent (in order to prove treble damages) and that MOC was willfully blind to infringement by others (in order to prove inducement of infringement). Thus, the Court **DENIES** ITW's motion to preclude evidence of MOC's size and status because that evidence is relevant to several of the issues to be tried.

//
//
//
//

---

[2] After hearing the Court's tentative ruling as to references to MOC's size and status as a family-owned business, ITW reasserted its position that even if MOC's size is relevant, its status as a family-owned business is not. As the Court indicated at oral argument, however, the Court is disinclined to restrict references to MOC as a family-owned business at this time. ITW is free to raise any objections on this basis at trial, should it deem it necessary.

**4. Plaintiff's MiL No. 4: Motion to Preclude MOC from Offering into Evidence Certain Exhibits Not Produced in Discovery (ECF No. 256)**

ITW seeks to preclude MOC from introducing the following exhibits into evidence: (1) Ex. 564: U.S. Patent No. 5,383,481 (Waelput); (2) Ex. 565: U.S. Patent No. 5,257,604 (Vataru); (3) Ex. 567: U.S. Patent No. 5,425,333 (Baylor); (4) Ex. 569: U.S. Patent No. 5,150,742 (Motohashi); (5) Ex. 605: Wynn's Combustion Chamber Cleaning Tool, 31912; (6) Ex. 606: Wynn's Air Induction Tool, 32000/33000; and (7) Ex. 616: Sales of MOC Product #72172. (Pl.'s MiL No. 4, at 4, ECF No. 256) As to the first four exhibits (the various other patents), MOC states that these exhibits "are unrelated to the remaining suit, and, thus, MOC agrees not to use them at trial." (Opp'n to Pl.'s MiL No. 4, at 2, ECF No. 264) Thus, the Court **GRANTS** ITW's motion as to these four exhibits. The motion is **DENIED** as to the remaining exhibits, for the reasons discussed at the August 9, 2012, hearing.

**5. Plaintiff's MiL No. 5: Motion to Preclude MOC from Offering into Evidence Deposition Testimony of Richard Scott from Another Lawsuit (ECF No. 257)**

ITW's final motion in limine seeks to preclude MOC from introducing the deposition testimony of Richard Scott, which was taken in the *EBS* case. (Pl.'s MiL No. 5, at 3, ECF No. 257) MOC asserts that Mr. Scott's deposition testimony is admissible under Federal Rule of Civil Procedure 32(a)(8) and Federal Rule of Evidence 804(b)(1). (Opp'n to Pl.'s MiL No. 5, ECF No. 265)

Rule 32(a)(8) permits the use of a deposition taken in an earlier action "in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action." Here, ITW asserts that Rule 32(a)(8) does not apply because this case and the *EBS* case did not involve the same subject matter: "The instant action currently involves automotive engine intake cleaning methods . . . . In contrast, [the *EBS* case] involved brake flush machines and methods of using those machines." (Pl.'s MiL No. 5, at 3, ECF No. 257) MOC characterizes the two suits more broadly, however, stating that both involve "automotive service equipment." (Opp'n to Pl.'s MiL No. 5, at 2, ECF No. 265) Moreover, specific to the testimony MOC seeks to introduce, MOC asserts that "ITW's

monitoring of MOC's product lines was an issue in both the EBS action and in this action." (*Id.* at 3 (citing *Hub v. Sun Valley Co.*, 682 F.2d 776, 778 (9th Cir. 1982)))

The same subject matter and same parties requirements of Rule 32 "have been construed liberally in light of the twin goals of fairness and efficiency." *Hub v. Sun Valley Co.*, 682 F.2d 776, 778 (9th Cir. 1982). Relevant here, the same subject matter requirement has generally been interpreted to require only "substantial identity of issues, rather than precisely the same subject matter . . . ." 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2150 (3d ed. 2010) (citing *Batelli v. Kagan & Gaines Co.*, 236 F.2d 167, 169 (9th Cir. 1956)). Further, "[t]he accepted inquiry focuses on whether the prior cross-examination would satisfy a reasonable party who opposes admission in the present lawsuit." *Hub*, 682 F.2d at 778; *see also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1019 (9th Cir. 2004).

The Court finds that there is a sufficient overlap in the issues in the *EBS* case and the instant case such that ITW had the same opportunity and motive to cross-examine Mr. Scott during his deposition in the prior action. The proposed deposition testimony concerns the frequency with which Mr. Scott policed competitors' websites and the extent of his awareness of the products MOC was selling. This testimony was relevant to the question of ITW's knowledge of competitors' products in both actions—*i.e.* for whether ITW willfully infringed the patents asserted in the *EBS* case, and for whether ITW knew of MOC's alleged infringement but nevertheless delayed in bringing suit (pertaining to MOC's laches defense) in the instant suit. (*See* Opp'n to Pl.'s MiL No. 5, at 4–5, ECF No. 265 ("The testimony . . . concerns an issue identical in each case—[ITW's] knowledge of MOC's products."))

However, depending on the Court's decision on the jury instructions and equitable defenses, MOC may not need to introduce any evidence of ITW's knowledge of MOC's products, in which case the Court is inclined to prohibit the deposition testimony. Although the issues are similar if broadly defined—*i.e.* both generally concern ITW's knowledge of MOC's products—they are not so overlapping that the Court does not have reservations about admitting the testimony unless it is directly relevant to a disputed issue at trial.

//

The difference in the issues, more narrowly defined, is as follows: In *EBS* the assertion was that ITW knew about MOC's products but infringed them anyway, supporting the claim that ITW willfully infringed MOC's patents. But here, the assertion is that ITW knew that MOC was infringing its patents, and yet delayed in bringing suit. Both—broadly—go to ITW's knowledge; but ITW may have had a different motive in cross-examining pertaining to a charge of willful infringement (a claim that MOC carried the burden to prove) than it did with regard to laches (an affirmative defense, which MOC also carried the burden to prove, but that ITW did not even contest at the summary judgment stage). In sum, the Court does not conclude that it would violate Rule 32 to allow the deposition testimony to be introduced, but **RESERVES RULING** on the motion until a later date.[3]

**6. Defendant's MiL No. 1: Motion to Exclude ITW's Damages Expert, Chris Barry, from Opining on ITW's Claim for Lost Profits and to Exclude ITW from Seeking Lost Profits Damages (ECF No. 247)**

MOC seeks to preclude ITW's expert, Christopher Barry, from opining regarding lost profits damages, and more generally seeks to preclude ITW from seeking lost profits damages at trial. (Def.'s MiL No. 1, ECF No. 247) MOC asserts the following reasons for why Barry's testimony should be excluded: (1) Barry's opinion regarding lost profits damages based on a market share approach are based on unreliable market-share data; (2) Barry's opinion regarding the profitability calculation is based on (a) incorrect and unsound methodology, and (b) information requested but not produced during discovery. (*Id.*) The Court will consider each basis for exclusion in turn.

If the jury determines that MOC has infringed ITW's patent, 35 U.S.C. § 284 provides that "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer . . . ." The statute authorizes two types of compensation for infringement: lost profits and reasonable

---

[3] Because Mr. Scott's testimony is admissible under Rule 32(a)(8), it need not also meet the requirements for admissibility set forth in Federal Rule of Evidence 804(b)(1). *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 914 (9th Cir. 2008). Thus, the Court need not consider MOC's alternative basis for admissibility under Rule 804(b)(1).

1  royalty damages. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).  The
2  statute goes on to provide: "The court may receive expert testimony as an aid to the determination
3  of damages or of what royalty would be reasonable under the circumstances."  35 U.S.C. § 284.
4        Federal Rule of Evidence 702 requires the expert witness's testimony be based on
5  sufficient facts or data, be the product of reliable principles and methods, and that the witness has
6  applied the principles and methods reliably to the facts of the case.  *Daubert  v. Merrel Dow*
7  *Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993), provides that the expert testimony must be
8  relevant and reliable, and that the party offering the expert testimony bears the burden of showing
9  the testimony meets these requirements.  The Court must exclude testimony that does not meet the
10 requirements of Rule 702.
11 ***A. Admissibility of Barry's Opinion Regarding Lost Profits Under the Market Share Approach***
12       ITW is seeking damages based on the theory of lost profits.  (*But see* Opp'n to Def.'s MiL
13 No. 2, ECF No. 268 (indicating that, in the event the jury finds ITW is not entitled to lost profits,
14 ITW plans to seek instead a reasonable royalty))  Lost profits are awarded to a patentee if it can
15 prove that there is a reasonable probability that the patentee would have made the infringer's
16 infringing sales "but for" the infringement.  *DSU Med. Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d
17 1140, 1148 (N.D. Cal. 2003) (citing *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577
18 (Fed. Cir. 1989)).  The Federal Circuit has enumerated a four-part "*Panduit* test" that typically
19 needs to be met in order for the patentee to be awarded lost profits: (1) demand for the patented
20 product, (2) absence of acceptable noninfringing substitutes, (3) manufacturing and marketing
21 capability to exploit the demand, and (4) the amount of the profit the patentee would have made.
22 *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).
23       The second factor of the *Panduit* test—absence of acceptable noninfringing substitutes—is
24 typically established by proving there is a reasonable probability that there were no acceptable
25 alternatives to the patented invention.  However, in certain circumstances, if the patentee cannot
26 prove that there were no acceptable noninfringing substitutes, damages may be based partially on
27 lost profits and partially on a reasonable royalty.  This requires a determination of what portion of
28 the purchasers of the infringing product would have purchased the substitute instead of the

patented product. *See BIC Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1219 (Fed. Cir. 1993) ("[A] patent owner may satisfy the second *Panduit* element by substituting proof of its market share for proof of the absence of acceptable substitutes. . . . This market share approach allows a patentee to recover lost profits, despite the presence of acceptable, noninfringing substitutes, because it nevertheless can prove with reasonable probability sales it would have made 'but for' the infringement." (citation omitted)).[4]

"To show 'but-for' causation, the patentee can reconstruct the market to determine what profits the patentee would have made had the market developed absent the infringing product." *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1377 (Fed. Cir. 2003). In reconstructing the hypothetical but-for market, the Federal Circuit requires "reliable economic evidence of 'but-for' causation" *id.*, based on "sound economic proof of the nature of the market and the likely outcomes with infringement factored out of the economic picture," *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999). "Where . . . such sound economic and factual predicates are absent from a [damages] analysis, Rule 702 requires this court to exclude that unreliable [expert opinion] evidence." *IP Innovation L.L.C. v. Red Had, Inc.*, 705 F. Supp. 2d 687, 689 (E.D. Tex. 2010) (Rader, J.).

---

[4] As an initial matter, MOC's motion in limine number 1 operates under the mistaken assumption that ITW will be exclusively pursuing lost profits based on a market share approach, (*see* Def.'s MiL No. 1, at 8–9, ECF No. 247), though ITW emphasizes that the market share approach is offered "[o]nly as a secondary theory," and that its primary theory will be to prove the absence of any acceptable noninfringing substitutes, (Opp'n to Def.'s MiL No. 1, at 2, ECF No. 267). According to MOC, "Barry concedes that 50% of MOC's allegedly infringing sales would have gone to others in the market, thereby . . . admitt[ing] that ITW is not entitled to lost profits on **all** of MOC's sales because other competitors had non-infringing alternatives and MOC's sales would have been distributed to all of the competitors[.]" (Def.'s MiL No. 1, at 8, ECF No. 247)

Upon a review of Barry's expert report, (Def.'s MiL No. 1 Ex. B, ECF No. 247-3), and excerpts from his deposition, (Def.'s MiL No. 1 Ex. C, ECF No. 247-4), the Court disagrees with MOC's characterization of Barry's—and thus ITW's—theory of damages. More accurately and completely, Barry's report states that "*even if* some of the inferior and/or more expensive products are credited as acceptable alternatives, [ITW] can still claim its but for market share in an appropriately defined market, by which its proportionate share of the accused units can be captured under a lost profits calculation." (Def.'s MiL No. 1 Ex. B, at 8, ECF No. 247-3 (emphasis added)); (*see also* Def.'s MiL No. 1 Ex. C, 2 ("[O]ur presumption based on the facts of the case could have been that the only two players that are in this induction tool that atomizes the fluid space are MOC and [ITW]. And in that scenario one could posit that [ITW] would pick up the entirety of MOC's sales. . . . However, [we] temper[ed] our claim for lost profit capture rate from the 100 percent that ostensibly might be argued to a very conservative 50-percent estimate.") It is clear then that ITW (and Barry) present the market share theory only as an alternative damages theory, and the Court declines to limit ITW to the market share approach at trial.

MOC's motion in limine number 1 seeks to exclude Barry's expert opinion to the extent he opines on the percentage market share that ITW holds. (Def.'s MiL No. 1, at 9–11, ECF No. 247) In his expert report and deposition testimony, Barry states that his lost profits damages calculation under the market share approach is based on his assumption that 50% of MOC's accused induction tools and associated fluids would be captured by ITW. He further indicates that he reached this assumption based on an estimate provided by Mark Hischier, an engineer and the Director of Technology at ITW. (Def.'s MiL No. 1 Ex. B, at 7 n.29, 9, 27–28, ECF No. 247-3); (Def.'s MiL No. 1 Ex. C, at 3, 5–6, ECF No. 247-4) MOC argues that Barry's "opinion regarding a 50% market share is not based on a single iota of economic data or other admissible evidence, and thus is unreliable" and should be excluded. (*Id.* at 9) Going even further, MOC contends that Barry should therefore be precluded from testifying about lost profits under the market share theory altogether. (*Id.* at 11)

The Court heard from the parties on this issue at length at the hearing on the motions in limine, and is inclined to agree with MOC, but not to go so far as to exclude Barry's lost profits testimony altogether. To the extent Barry's lost profits damages testimony is based on an underlying factual assumption that ITW held 50% of the market share, his testimony is admissible as expert testimony. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) ("When . . . the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *SynQor, Inc. v. Artesyn Techs., Inc.*, 2010 U.S. Dist. LEXIS 144244, at *18 (E.D. Cal. Dec. 13, 2010) ("[A]ssuming that the information provided to [the damages expert] by [the technical experts] is supported by proper factual predicates, [the damage expert's] reliance on this information does not compel the exclusion of [his testimony]."); (Opp'n to Def.'s MiL No. 1, at 3, ECF No. 267 (suggesting that the jury should be the arbiter of whether the factual basis for Barry's opinion is sufficiently reliable)). MOC's concerns in this regard go to the *weight* Barry's testimony should be afforded, not to its *admissibility*. Such considerations can be dealt with on cross-examination (of Barry and of Mr. Hischier). Thus, as to MOC's request that Barry's testimony regarding lost profits damages under the market share theory be excluded altogether, the Court **DENIES** the motion.

1   However, to the extent Barry opines or plans to opine on ITW's market share—as opposed
2   to merely basing his damages calculation on an underlying assumption as to ITW's market
3   share—the Court **GRANTS** the motion.  The Court agrees that any opinion offered on this basis
4   would not appear to be "based on sufficient facts or data," nor "the product of reliable principles
5   and methods."  Fed. R. Evid. 702; *see also Linear Tech. Corp. v. Micrel, Inc.*, 2006 U.S. Dist.
6   LEXIS 96860, at *262 (N.D. Cal. June 9, 2006) (excluding expert testimony on patent damages
7   "as unreliable because (1) the calculations are not based upon sufficient facts or data and (2) the
8   calculations are not the product of reliable principles and methods"); *DSU Med. Corp.*, 296 F.
9   Supp. 2d at 1158 ("[Plaintiff's expert] does not supply us with sound economic data for that
10  fundamental posit of an accurate reconstructed market.").

11  The extent of Barry's opinion as to lost profits under the market share approach in his
12  expert report is as follows:

> To my knowledge, [ITW] and MOC are the only manufacturers of simple, hand-held induction tools that atomize the cleaning fluid.  Other manufacturers make non-atomizing induction tools, but they are inferior or much more expensive . . . . In the "but for" scenario", [sic] it is likely that MOC's induction tool customers would buy [ITW's] induction tool.  However, some customers might not be educated on [ITW's] products and the availability of the hand-held atomizing induction tool.  Therefore, I conservatively assume that only 50% of MOC's accused induction tools and associated fluids would be captured by [ITW].

(Def.'s MiL No. 1 Ex. B, at 8–9. ECF No. 247-3)  Barry's deposition testimony confirms that he is
prepared to testify that, in his expert opinion, ITW would have captured 50% of MOC's sales of its
induction tool product had MOC's allegedly infringing product not been on the market.  And, in
both his expert report and his deposition testimony, Barry makes clear that he bases this
conclusion exclusively on information provided to him by ITW employees—in particular, Mr.
Hischier—but that he did not engage in any additional research or independent investigation in
order to evaluate ITW's percentage market share.

In opposition to MOC's motion, ITW asserts that "Barry bases his 50% estimate on
discussions with Mark Hischier, [ITW's] Director of Technology who is intimately familiar with
the induction tool market," but offers no other argument as to the sufficiency of Barry's facts and
data or the reliability of his methods.  (Opp'n to Def.'s MiL No. 1, at 4, ECF No. 267)  The Court
doubts that bare reliance on a "rough estimate" given by ITW's own Director of Technology is the

1  type of reliable method based on sufficient facts that *Daubert* envisioned.[5] *See, e.g.*, *Linear Tech. Corp.*, 2006 U.S. Dist. LEXIS 96860, at *261–62 (excluding expert testimony on patent damages where "Plaintiff's expert . . . conceded that his arbitrary market share calculations [were] based merely on 'economic theory' without reliable evidentiary support"); *EZ Dock, Inc. v. Schafer Sys.*, 2003 U.S. Dist. LEXIS 3634, *16 (D. Minn. Mar. 8, 2003) (excluding expert testimony on patent damages where "[the] expert report points to *no* facts that underlie [the expert's] proposed testimony regarding . . . the nature of the market as a two-supplier market").

In sum, to the extent that Barry will testify as to lost profits damages under the market share theory based on the underlying factual assumption that ITW's market share is 50%, his testimony is allowed and the motion in limine **DENIED**. However, to the extent that Barry will testify that it is his opinion that ITW's market share is 50%, his testimony does not appear to be grounded in sound economic and factual predicates and is therefore excluded and the motion in limine **GRANTED**.

### B. Admissibility of Barry's Opinion Regarding the Profitability Calculation

MOC seeks to preclude Barry from testifying as to the fourth element of the *Panduit* test, the profit ITW would have made but for MOC's infringing activities. According to MOC, Barry's profitability calculation utilizes unsound methodology and is based on information that was not produced to MOC during discovery, and his testimony should therefore be excluded for one or both of these reasons. (Def.'s MiL No. 1, at 12–16, ECF No. 247)

*(1) Exclusion Based on Methodology of Profitability Calculation*

ITW is seeking lost profits for both the sales of MOC's allegedly infringing Universal Induction Tool as well as the sales of certain fluid that is used in operating that tool. What MOC's motion takes issue with is Barry's profitability calculation pertaining to the sales of the fluid: "Mr. Barry inflates the amount of lost profits by using <u>MOC's</u> selling price less <u>[ITW's]</u> cost of the fluid." (*Id.* at 12) According to MOC, "[c]omingling <u>MOC's</u> selling price of the fluid with

---

[5] At oral argument, ITW argued that the Court's determination on this issue is premature. According to ITW, it will not be clear whether Barry's testimony is admissible until Mr. Hischier testifies at trial. The Court is willing to revisit the issue if ITW wishes to raise it again after Mr. Hischier testifies, but is inclined to disagree that Mr. Hischier's testimony can or will have any bearing on the admissibility of Barry's expert opinion as to market share.

1  [ITW's] cost of the fluid is an improper method of determining what [ITW's] profitability would
2  have been 'but for' the infringement." (*Id.* at 13) ITW opposes, arguing simply that MOC can
3  cross-examine Barry as to all of the *Panduit* factors at trial, including "regarding his use of MOC's
4  selling price as opposed to [ITW's] in calculating damages." (Opp'n to Def.'s MiL No. 1, at 5)

   Generally speaking, "[t]he measure of lost profits is the difference between the patent owner's cost of production and the price at which the patent owner would have sold the product." *Beckson Marine, Inc. v. NFM, Inc.*, 2007 U.S. Dist. LEXIS 21916, at *7 (W.D. Wash. Mar. 27, 2007) (citing *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 655 (Fed. Cir. 1985)). Estimating these two variables—the "price variable" and the "cost variable"—can be done in any number of ways, and courts have taken into account a variety of considerations. For example, the price variable might be estimated based on the price the patentee actually charged for its patented product, or on a hypothetical price the patentee would have charged had the infringer not been competing in the market. *See Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l*, 246 F.3d 1336, 1357 (Fed. Cir. 2001); *King Instr. Corp. v. Otari Corp.*, 767 F.2d 853 (Fed. Cir. 1985); *Lam Inc. v. Johns-Manville Corp.*, 718 F.2d 1056 (Fed. Cir. 1983). Moreover, "[a] patent owner can compute his lost profits directly, through his anticipated profit margin, or indirectly, through use of the infringer's profit margin. The infringer's profits may properly be considered, for comparison purposes with the patent owner's proof of his lost profits, in estimating the patent owner's damages." *Beckson Marine*, 2007 U.S. Dist. LEXIS 21916, at *7 (citing *Kori Corp.*, 761 F.2d at 655).

   Here, for the price variable, ITW's expert generally utilized the average selling price that MOC sold its products at.[6] For the cost variable, on the other hand, Barry used the cost of the

---

[6] Barry's expert report discusses lost profits damages pertaining to the products covered by the '638 patent as well as the '629 and '855 patents, which the Court previously invalidated. Given the distinction MOC is highlighting pertaining to Barry's lost profits damages calculations for the Universal Induction Tool itself and its associated fluids—*i.e.*, that in estimating the price variable Barry used ITW's price for the tool but MOC's price for the fluids—it is worth noting that Barry utilized MOC's price for all of his damages calculations except for the price of the tool. Thus, even though MOC's motion seemingly suggests that Barry disingenuously used MOC's price figures for the fluid sales in order to capture the 30%-higher price MOC was selling its fluid at, that does not appear to be the case.

Instead, as Barry explains in a footnote in the expert report and at his deposition, the true aberration is that he used ITW's price in estimating the price variable for the tool. And, he explains

1  goods that were sold by ITW. (Def.'s MiL No. 1 Ex. B, at 9, ECF No. 247-3 ("When determining
2  the profit that [ITW] would have made on its captured portion of MOC's accused products, I use
3  MOC's average selling price . . . and [ITW's] cost of goods sold . . . to reflect MOC's market
4  pricing and channel mix, but as manufactured under [ITW's] cost structure." (footnote omitted)))
5  MOC takes issue with this methodology, arguing that the mixing-and-matching of MOC's price
6  with ITW's costs is improper.

7  Although the Court did not find any case law supporting Barry's methodology of using the
8  infringer's price less the patentee's cost to calculate the measure of lost profits, the Court also did
9  not find any case law discrediting this method. *See Micro Chem.*, 317 F.3d at 1392–93 (upholding
10  district court's refusal to exclude expert testimony on the basis of "unreliable methodology" where
11  the expert's methodology was consistent with the legal framework for patent damages). The Court
12  therefore doubts that Barry's methodology is so unreliable as to warrant exclusion under Rule 702.
13  Indeed, the measure of lost profits damages need only be a "reasonable approximation." *Kori*
14  *Corp.*, 761 F.2d at 655 (upholding a lost profits damages award where the measure of the
15  patentee's damages was estimated based on the infringer's profit margin). Under this standard, the
16  Court declines to exclude Barry's profitability calculations for being based on unreliable
17  methodology. The proper way to challenge Barry's profitability calculations is via "[v]igorous
18  cross-examination, presentation of contrary evidence, and careful instruction on the burden of
19  proof . . . ." *Daubert*, 509 U.S. at 595. MOC's motion to exclude Barry's testimony as to the
20  profitability calculation is therefore **DENIED** on this basis.
21  *(2) Exclusion Based on Information Not Produced in Discovery*

22  MOC next contends that Barry's profitability calculation uses information requested but
23  not produced during discovery, and should therefore be excluded. As above, the Court is
24  disinclined to exclude this evidence on the basis of ITW's alleged discovery violation. MOC

---

26  that he used ITW's price because "MOC's would produce negative margins"—*i.e.*, MOC sold its tool
   at a lower price than it cost ITW to produce its own tool. (Def.'s MiL No. 1 Ex. B, at 10 n.47, ECF
27  No. 247-3); (*see also* Def.'s MiL No. 1 Ex. C, at 9, ECF No. 247-4) (noting that for the '629/'855
   patent tools and fluid he "used the same methodology, which is to use the infringer's average selling
28  price as compared to the plaintiff patentee's average cost to calculate the lost profits, which is the way
   I do it in virtually every case")

acknowledges that the data it refers to is attached as an exhibit to Barry's expert report, (*see* Def.'s MiL No. 1, at 16, ECF No. 247), and therefore it has had access to these documents for over a year—since July 29, 2011, (*See* Decl. of Brian Arnold ISO Opp'n to Def.'s MiL No. 1 ¶ 4, ECF No. 267-1). The Court therefore finds that exclusion of this evidence is an unwarranted sanction in light of the fact that MOC has had ample opportunity to cure any potential prejudice ITW's errors may have caused. Thus, MOC's motion to exclude the testimony of Barry as to his profitability calculation is **DENIED** on this basis as well.

**7. Defendant's MiL No. 2: Motion to Exclude ITW's Damages Expert's Supplemental Expert Report (ECF No. 250)**

In its second motion in limine, MOC moves to exclude Barry's supplemental expert "to the extent he claims new damages not contained in his original report." (Def.'s MiL No. 2, at 2, ECF No. 250) In MOC's estimation, Barry's supplemental report is not merely an "update" to the initial expert report—allowable under Rule 26—but rather it includes "a new theory of calculating damages," necessitating its exclusion. (*Id.* at 4) Specifically, in his original expert report, Barry calculated ITW's damages as to the fluid sales only under a lost profits theory of damages. (Def.'s MiL No. 2 Ex. C, at 19, ECF No. 250-4 (original expert report)) But, in the supplemental report, Barry sets forth a damages calculation as to the fluid sales that includes a reasonable royalty analysis. (Def.'s MiL No. 2 Ex. D, at 6, ECF No. 250-5 (supplemental expert report))

ITW argues that the supplemental report should be allowed because Barry appropriately supplemented his report in light of MOC's intent to challenge ITW's entitlement to lost profits damages. (Opp'n to Def.'s MiL No. 2, ECF No. 268) MOC finds this justification to be "disingenuous" in light of the fact that Barry and ITW were on notice of MOC's intent to challenge ITW's claim for lost profits as of the date that MOC's expert served his rebuttal report, on September 9, 2011, and yet did not serve the supplemental report until May 17, 2012.[7] (Def.'s

---

[7] MOC indicates in its motion that David Weiner's rebuttal report was served on August 21, 2011. (Def.'s MiL No. 2, at 4, ECF No. 250) The report, attached as an exhibit to MOC's motion, is marked with a different, later date, however: September 9, 2011. (Def.'s MiL No. 2 Ex. E, ECF No. 250-6 (rebuttal report)) Regardless of which date is correct, MOC's point carries the same weight: ITW knew of MOC's intention to challenge its claim to lost profits long before preparing and serving its supplemental expert report in May 2012.

MiL No. 2, at 4, ECF No. 250)

Even so, ITW contends that any delay in disclosure was substantially justified and harmless, and therefore exclusion is not warranted here. (Opp'n to Def.'s MiL No. 2, at 1, ECF No. 268) Indeed, ITW notes that MOC has been on notice of the possibility that ITW would seek reasonable royalty damages based on its responses to interrogatories, and that it has offered to cure any prejudice MOC may have suffered by virtue of ITW's late supplement to its damages calculation. (*Id.* at 2–3) Specifically, ITW has offered to make Barry available for an additional deposition, but MOC has yet to respond to this offer. (*Id.* at 3)

Because this motion in limine concerns application of the Federal Rules of Civil Procedure, the law of the Ninth Circuit applies. *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 994 (Fed. Cir. 2007) (reviewing the district court's exclusion of an expert's supplemental report under Rule 26(e): "Evidentiary rulings do not generally raise issues unique to patent law. Therefore, . . . the law of the appropriate regional circuit [applies] to such procedural rulings.") *Trilogy Communs., Inc. v. Times Fiber Communs., Inc.*, 109 F.3d 739, 744 (Fed. Cir. 1997) (applying regional circuit law in reviewing a district court's decision to exclude a supplemental expert report).

Federal Rule of Civil Procedure 26(e) requires a party to supplement information provided in an expert report or given at the expert's deposition "if the party learns that in some material respect the disclosure or response is incomplete or inaccurate." However,

> supplementary disclosures do not permit a party to introduce new opinions after the disclosure deadline under the guise of a 'supplement.' Although Rule 26(e) obliges a party to 'supplement or correct' its disclosures upon information later acquired, this does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report (indeed, the lawsuit from the outset). To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports.

*Plumley v. Mockett*, 2010 U.S. Dist. LEXIS 57254, at *6 (C.D. Cal. May 26, 2010) (internal quotation marks omitted). "Accordingly, a supplemental expert report that states additional opinions or seeks to 'strengthen' or 'deepen' opinions expressed in the original expert report is beyond the scope of proper supplementation and subject to exclusion under Rule 37(c)." *Id.* (internal quotation marks omitted).

Rule 37(c)(1) "gives teeth" to Rule 26(e) "by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). The rule nevertheless provides for "[t]wo express exceptions [to] ameliorate the harshness of Rule 37(c)(1): The information may be introduced if the parties' failure to disclose the required information is substantially justified or harmless." *Id.*

Although the Court would appear to be completely within its discretion if it elected to exclude Barry's supplemental expert report, it nevertheless declines to do so. Even assuming Barry would have been justified in supplementing his report in light of MOC's contesting his damages theory, given the eight-month delay between MOC's rebuttal report and ITW's supplemental report, the Court agrees with MOC and doubts the veracity of this explanation for ITW's delay. Moreover, the Court agrees that the supplemental report does not appear to be a true "supplement" to Barry's original expert report under Rule 26. Adding this new, alternative theory of damages is not the type of supplementation that Rule 26 envisions. *See Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002) ("Rule 26(e) envisions supplementation when a party's discovery disclosures happen to be defective in some way so that the disclosure was incorrect and incomplete, and, therefore, misleading. It does not cover failures of omission because the expert did an inadequate or incomplete preparation." (citations omitted)).

However, the Court is hesitant to preclude ITW from offering Barry's supplemental expert testimony in light of its import to this case and the fact that much of the prejudice to MOC is still able to be cured. Should the jury determine that ITW is not entitled to lost profits for MOC's alleged infringement, ITW should be permitted to pursue damages under its alternative reasonable royalty approach, lest it come away with nothing should it be unable to meet the much higher bar of proving lost profits damages. But, ITW should not be allowed to come away unscathed by its discovery violation.

In light of the above, the Court does not strike Barry's supplemental expert report but will allow MOC to conduct a further deposition of Barry prior to the commencement of trial in order to limit any prejudice to MOC. As indicated at the hearing on the motions in limine, the scope of the

1 deposition should be limited to the new opinions contained in the supplemental expert report
2 pertaining to ITW's alternative theory of damages for the fluids under the reasonable royalty
3 approach. The deposition shall take place as soon as reasonably possible, shall not exceed four
4 hours, and all costs of the deposition—including costs of transcripts—shall be borne by ITW.
5 MOC is not entitled to reimbursement for any non-deposition-related costs, such as any costs
6 associated with preparing a supplemental rebuttal report (if necessary[8]).

**8. Defendant's MiL No. 3: Motion to Exclude Evidence or Argument that the QMI Induction Tool and MOC HDIC Do Not "Utilize an Aspirator" (ECF No. 251)**

MOC's third motion in limine seeks to exclude any evidence or argument that the QMI Induction Tool and MOC HDIC do not "utilize an aspirator," in light of the Court's ruling as a matter of law that there is no genuine issue that both of these tools utilize an aspirator. (Def.'s MiL No. 3, ECF No. 251 (citing MSJ Order 18, ECF No. 219)) ITW does not strictly oppose MOC's third motion in limine, characterizing its brief as a "response" rather than "opposition." (Resp. to Def.'s MiL No. 3, ECF No. 266) This motion in limine is **GRANTED**.

**9. Defendant's MiL No. 4: Motion to Exclude Evidence or Argument Regarding Modified QMI Induction Tool (ECF No. 252)**

MOC's final motion in limine seeks to exclude evidence and argument regarding a modified QMI Induction Tool. On August 2, 2012, ITW filed a notice of non-opposition to this motion in limine. (ECF No. 286) Accordingly, the Court **GRANTS** MOC's motion in limine number 4.

## CONCLUSION

In summary, for the reasons stated above, the Court makes the following rulings on the nine motions in limine:

(1) Plaintiff's Motion in Limine to Preclude Defendant from Referencing Certain Alleged Acceptable Non-Infringing Substitutes to the Patented Inventions is **GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART** (ECF No. 253);

---

[8] The Court makes no comment as to whether a supplemental expert report must be produced, and reminds the parties to meet and confer as to the necessity of preparing a supplemental rebuttal report.

1  (2) The Court **RESERVES RULING ON** Plaintiff's Motion in Limine to Preclude
2  Defendant from Referencing Alleged Motive of Plaintiff in Bringing Lawsuit (ECF No.
3  254);
4  (3) The Court **DENIES IN PART AND RESERVES RULING ON IN PART**
5  Plaintiff's Motion in Limine to Preclude Defendant from Referencing Illinois Tool
6  Works' Size or Defendant's Status as a Family Business (ECF No. 255);
7  (4) Plaintiff's Motion in Limine to Preclude Defendant from Offering into Evidence
8  Certain Exhibits Not Produced in Discovery is **GRANTED IN PART AND DENIED**
9  **IN PART** (ECF No. 256);
10 (5) The Court **RESERVES RULING ON** Plaintiff's Motion in Limine to Preclude
11 Defendant from Offering into Evidence Deposition Testimony of Richard Scott from
12 Another Lawsuit (ECF No. 257);
13 (6) Defendant's Motion in Limine to Exclude ITW's Damages Expert, Chris Barry, from
14 Opining on ITW's Claim for Lost Profits and to Exlcude ITW from Seeking Lost Profits
15 Damages is **GRANTED IN PART AND DENIED IN PART** (ECF No. 247);
16 (7) Defendant's Motion in Limine to Exclude ITW's Damages Expert's Supplemental
17 Expert Report is **DENIED** (ECF No. 250);
18 (8) Defendant's Motion in Limine to Exclude Evidence or Argument that the QMI
19 Induction Tool and MOC HDIC do not "Utilize an Aspirator" is **GRANTED** (ECF No.
20 251); and
21 (9) Defendant's Motion in Limine to Exclude Evidence or Argument Regarding Modified
22 QMI Induction Tool is **GRANTED** (ECF No. 252).
   **IT IS SO ORDERED**.

DATED: August 17, 2012

*Janis L. Sammartino*
Honorable Janis L. Sammartino
United States District Judge