1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ILLINOIS TOOL WORKS, INC. DBA WYNN'S, a Delaware corporation, | CASE NO. 09CV1887 JLS (MDD) |
| Plaintiff, | **ORDER DENYING MOTION FOR NEW TRIAL** |
| vs. | (ECF No. 422) |
| MOC PRODUCTS COMPANY, INC., a California corporation, | |
| Defendant. | |

Presently before the Court is Defendant MOC Products Company, Inc.'s ("MOC") Motion for New Trial. (Mot. for New Trial, ECF No. 422.) Also before the Court is Plaintiff Illinois Tool Works d/b/a Wynn's ("ITW") response in opposition, (Resp. in Opp'n, ECF No. 434), and MOC's reply in support. (Reply in Supp., ECF No. 436.) The motion hearing that was set for January 23, 2014 was vacated and the matter taken under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1). Having considered the parties' arguments and the law, the Court **DENIES** the motion.

**BACKGROUND**

The factual and procedural history of this patent infringement suit has been set forth in previous opinions. (*See, e.g.*, Order on Summ. J., Mar. 6, 2012, ECF No. 219; Order on Post-Trial Matters, Jun. 24, 2013, ECF No. 383; Order on Enhanced

Damages, Prejudgment Interest, and Attorneys' Fees, Oct. 23, 2013, ECF No. 410.)
This order incorporates by reference the background material set forth in those prior
decisions.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 59(a)(1) provides, in pertinent part:

> **(1)** ***Grounds for New Trial.*** The court may, on motion, grant a
> new trial on all or some of the issues—and to any party—as
> follows:
> **(A)** after a jury trial, for any reason for which a new trial has
> heretofore been granted in an action at law in federal court; or
> **(B)** after a nonjury trial, for any reason for which a rehearing
> has heretofore been granted in a suit in equity in federal court.

Whether to grant a new trial is a matter of the trial court's discretion. *City
Solutions, Inc. v. Clear Channel Commc'ns*, 365 F.3d 835, 843 (9th Cir. 2004). The
court may grant a new trial if "the verdict is contrary to the clear weight of the
evidence, or is based upon evidence which is false, or to prevent, in the sound
discretion of the trial court, a miscarriage of justice." *United States v. 4.0 Acres of
Land*, 175 F.3d 1133, 1139 (9th Cir. 1999) (quoting *Oltz v. St. Peter's Cmty. Hosp.*,
861 F.2d 1440, 1452 (9th Cir. 1988)).

**ANALYSIS**

MOC moves for a new trial with respect to invalidity and damages on the
grounds that (1) ITW improperly raised limitations of the '638 patent at trial that had
already been resolved at the summary judgment stage; and, (2) ITW's damages
expert Christopher Barry was allowed to present speculative and unsupported
testimony at trial regarding lost profits. The Court addresses each argument in turn.

**1.    Did ITW Improperly Contest Elements At Trial That Were Decided at
       Summary Judgment?**

According to MOC, ITW made arguments at trial regarding the '638 patent's
validity that were expressly or impliedly resolved at summary judgment. The Court
finds MOC's reasoning unpersuasive, however, because (1) the summary judgment
proceedings did not address whether the prior art embodied the limitations of the

'638 patent's dependent claims, such that ITW was free to raise those matters at trial, and, (2) even if ITW was foreclosed from arguing that the prior art lacked those limitations, a new trial on invalidity is unwarranted because the jury expressly found, after a full and fair hearing, that the prior art does not atomize.  The Court elaborates on each of these holdings in turn.

**A.    *Neither the Court's Summary Judgment Order Nor ITW's Pre-Trial Filings Precluded ITW From Arguing at Trial That the Prior Art Did Not Include the Limitations of the' 638 Patent's Dependent Claims***

MOC contends that, prior to trial, ITW conceded that most elements of the asserted claims of the'638 patent were present in the prior art and disputed only *two* elements—whether the prior art atomized and whether the prior art utilized an aspirator.  (Mot. for New Trial 2, ECF No. 422.)  According to MOC, only these two limitations were disputed in ITW's rebuttal expert report, as well as in ITW's summary judgment briefing.  (*Id.* at 2–5.)

Further, MOC argues that the Court's summary judgment order "left open only one triable issue with respect to anticipation: whether the prior art tools 'atomize.'"  (*Id.* at 6.)  MOC emphasizes that the Court's order sided with MOC regarding the aspirator limitation, expressly precluding ITW from arguing at trial that the prior art tools do not "utilize an aspirator," as required by the asserted claims.  (*Id.* at 7.)  Because the atomization and aspirator limitations were the only elements disputed by the parties and addressed by the Court prior to trial, MOC maintains that it "had no reason to know [that] ITW could still contest" other limitations of the patent at trial.  (*Id.*)

Thus, MOC contends that it was improper for ITW to raise the limitations of dependent claims 2–3 and 6–8 at trial.  (*Id.* at 9–11.)  ITW argued to the jury that the prior art tools did not have an aspirator with a "through bore of determined diameter," as required by Claims 2 and 6, as well as an "end portion of tapering outer diameter" and "a plurality of gradated substantially cylindrical diameter

sections," as required by Claim 8.  (*Id.*)  MOC insists that ITW was foreclosed from
making these arguments and that MOC had a right to rely on the summary judgment
proceedings in preparing for a trial focused exclusively on the question of whether
the prior art atomized.  (*Id.* at 8.)

      The Court finds MOC's interpretation of the summary judgment proceedings
unpersuasive.  As the Court has previously indicated, MOC's summary judgment
motion on invalidity was denied due to a genuine factual dispute regarding
atomization and the limitations of the dependent claims were never addressed by the
Court.  (*See* Order Regarding Enhanced Damages, Prejudgment Interest, and
Attorney's Fees 8–9, Oct. 25, 2013, ECF No. 410 ("Although the parties did not
address the limitations of [the dependent claims] at the summary judgment stage, the
Court did not, as MOC seems to suggest, enter an order stating that those elements
were 'not genuinely in dispute,' as permitted by Rule 56.").)  Because the Court's
order did not enter summary judgment in favor of MOC on the dependent claims, it
would appear that ITW was not foreclosed from raising the additional limitations at
trial.  *See, e.g.*, *Glaros v. H.H. Robertson Co.*, 797 F.2d 1564, 1573 (Fed. Cir. 1986)
("An order granting a judgment on certain issues is a judgment on those issues.  It
forecloses further dispute on those issues at the trial stage.  An order *denying* a
motion for . . . summary judgment, on the other hand, is merely a judge's
determination that genuine issues of material fact exist.  It is not a judgment, and
*does not foreclose trial on the issues on which summary judgment was sought*. . . .
Denial of summary judgment is strictly a pretrial order that *decides only one
thing—that the case should go to trial*." (emphasis added) (internal quotation marks
omitted)).  MOC retained the burden of proving invalidity at trial by clear and
convincing evidence.  *OSRAM Sylvania, Inc. v. Am. Induction Technologies, Inc.*,
701 F.3d 698, 704 (Fed. Cir. 2012) ("Patents are presumed to be valid and invalidity
must be proven by clear and convincing evidence.").  Accordingly, the Court finds
that ITW's arguments at trial regarding the patent's dependent claims were not

1   improper and do not justify a new trial on invalidity.[1]

2   **B.      Even If ITW Improperly Contested These Elements, a New Trial on**
3           **Invalidity is Unwarranted Because the Jury Expressly Found That the**
4           **Prior Art Did Not Atomize**

5           Even if MOC is correct that the limitations of the dependent claims were
6   resolved at the summary judgment stage, a new trial is still unwarranted because the
7   jury expressly determined that the prior art did not atomize.  (*See* Special Verdict
8   Form 8, ECF No. 360 ("The Prior Art did not introduce the liquid cleaner into the
9   intake manifold as an atomized substantially non-precipitating mist").)  The
10  atomization limitation was independent of the other issues that MOC believes were
11  improperly raised at trial and the jury's verdict on this question was supported by
12  substantial evidence.  (*See* Order on Post-Trial Matters 10–11, 14, ECF No. 383.)
13  Thus, any error in admitting ITW's evidence and argument regarding the dependent
14  claims of the patent did not prejudice MOC's case regarding anticipation.[2]  Because
15  the crucial question of whether the prior art atomized was fully and fairly resolved
16  by the jury, the Court in its discretion declines to order a new trial on invalidity.  *See*
17  Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or
18  excluding evidence—or any other error by the court or a party—is ground for
19  granting a new trial.").

20  ///

21  ///

22

23      [1] If the limitations of the dependent claims were entirely undisputed prior to trial,
    as MOC contends, it is unclear why the parties specifically requested that the jury
24  address those matters in the verdict form. (*See* Special Verdict Form 7–8, ECF No. 360
    ("The Prior Art did not utilize an aspirator with a body having a through bore of
25  determined diameter. . . . The Prior Art did not provide that aspirator body with an end
    portion of tapering outer diameter. . . . The Prior Art did not provide that aspirator body
26  with a plurality of gradated substantially cylindrical diameter sections at the end portion
    of tapering outer diameter.").)

27      [2] If the dependent claims were improperly raised at trial, then the Court's rulings
    regarding objective willfulness and enhanced damages may be revisited on appeal, as
28  MOC has previously requested.  (*See* MOC's Resp. in Opp'n to Mot. for Enhanced
    Damages 10, ECF No. 396.)

**2.     Did ITW Improperly Present At Trial Speculative Opinions Regarding Damages in Violation of the Federal Rules of Evidence?**

MOC also moves for a new trial on the grounds that ITW's damages expert Christopher Barry was erroneously permitted to provide prejudicial testimony regarding ITW's entitlement to lost profits.  Specifically, MOC contends that (1) Barry's opinion that ITW would have captured 50% of MOC's induction tool and fluid sales should have been kept from the jury because it was unsupported by any reliable methodology and lacked any factual basis in the record; and (2) Barry's testimony regarding MOC's Deluxe tool should have been excluded because Barry's opinions were not disclosed in his expert report and entirely failed to address the Deluxe tool as an acceptable non-infringing substitute.  The Court addresses each of MOC's arguments in turn.

***A.     Barry's Testimony That ITW Would Capture of 50% of MOC's Infringing Sales Does Not Warrant A New Trial***

MOC maintains that Barry's testimony that ITW would have captured 50% of MOC's infringing tool and fluid sales should never have been admitted because Barry identified no empirical support for a 50% capture rate and his opinion was not based on a reliable or scientific methodology.  The Court declines to order a new trial for MOC, however, because (1) Barry's testimony regarding lost profits was permissibly based on disputed facts and MOC's objections to his method of calculating damages were properly addressed by way of cross-examination, and, (2) even if Barry's testimony was inadmissible, there is still significant evidence in the record supporting the jury's award of lost profits.  The Court elaborates on each of these holdings in turn.

*(1)     Barry's Testimony Was Admissible*

At trial, ITW relied on an unusual "hybrid" theory of damages, in which Barry testified that ITW was entitled to lost profits because there were no acceptable non-infringing substitutes, yet based his damages calculation on an assumption that ITW

would capture only 50% of MOC's infringing tool and fluid sales.  (Trial Tr., Day 6, 94:3–5.)  MOC filed a motion in limine before trial to exclude Barry's testimony regarding the 50% capture rate.  The Court granted in part and denied in part the motion, holding that Barry was permitted to base his damages calculation on an assumption that ITW would pick up 50% of infringing sales, but precluding Barry from opining as an expert that ITW's market share was 50% because his opinion was not "grounded in sound economic and factual predicates."  (Order on Motions in Limine 12, Aug. 17, 2012, ECF No. 289.)  At trial, Barry hewed closely to the Court's evidentiary ruling, testifying only that he "elected to assume" a 50% capture rate in calculating damages because "customer loyalty programs" and "imperfect knowledge on the part of the consumer" would likely impede ITW from capturing all of MOC's sales, despite the absence of acceptable substitutes.  (Trial Tr., Day 6 34:9–10.)

Now, MOC contends that ITW ultimately failed to provide an underlying factual basis at trial for Barry's 50% capture rate assumption, such that Barry's testimony regarding lost profits was entirely arbitrary and unreliable.  (Mot. for New Trial 12–14, ECF No. 422.)  MOC maintains that a new trial is warranted because Barry's fictitious capture rate persuaded the jury to award lost profits to which ITW was not entitled.  (*Id.* at 12.)

The Court disagrees with this interpretation of Barry's damages calculation, however.  As the Court previously explained, Barry's 50% capture rate was admissible as an "assumption" because an expert's opinion may rely on disputed facts.  (*See* Order on Motions in Limine 12, Aug. 17, 2012, ECF No. 422 (citing *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003)).)  When an expert's testimony relies on one party's version of the facts, it is not the Court's role to evaluate whether those facts are correct.  (*See id.*)

Here, ITW's version of the facts, as presented at trial, did provide some basis for Barry's 50% capture rate assumption.  To be sure, neither party's fact witnesses

1   explicitly testified that ITW's market share was 50% or that ITW would have picked

2   up 50% of MOC's infringing sales.  MOC's CEO, Mark Waco, insisted that MOC

3   never lost a customer to ITW over the properties of its induction tool, (Trial Tr., Day

4   3, 105:5–7), while ITW's Director of Technology, Mark Hischier, narrowly defined

5   the relevant market as head-to-head competition between MOC and ITW to supply

6   atomizing induction tools to car dealerships.  (Trial Tr., Day 4, 183:11–184:6.)

7   Hischier testified that certain pressurized tools supplied by BG were highly

8   effective, but significantly more expensive and more complicated to use, such that

9   customers did not view those tools as acceptable substitutes for MOC's infringing

10  Universal Induction Tool.  (Trial Tr., Day 5, 67:23–69:1.)  Nevertheless, Hischier

11  did concede that some "high end shop[s]" may be less sensitive to the increased cost

12  and sophistication of BG's pressurized tools.  (Trial Tr., Day 5, 68:8.)  For example,

13  Hischier testified that mechanics at a local "Ferrari shop" had "no trouble"

14  disconnecting a vehicle's fuel lines and using a more expensive pressurized tool.

15  (Trial Tr., Day 5, 68:9–10.)

16       Because pressurized tools could be viewed as competing with ITW in the

17  relevant market, there was some factual basis for Barry's assumption that a

18  competitor could siphon off part of MOC's infringing sales.  Barry's assumption in

19  calculating damages was intended to take into account variables such as brand

20  loyalty, "propensity to buy from single or familiar suppliers," as well as "other

21  competitive advantages," all of which are expected to be modeled as part of the

22  patent holder's reconstruction of the but for environment.  Bryan Butler, *Patent*

23  *Infringement: Compensation and Damages* § 9.04[1][a].  "It is ultimately up to the

24  trier of fact [after] hear[ing] the rationale for the assumptions behind the but for

25  estimates [to] decide which to allow."  *Id.*  At trial, the jury heard evidence that some

26  customers were at times willing to use BG's more expensive and more complicated

27

28

1   pressurized tools.[3]  The jury could have relied on this evidence to credit Barry's

2   assumption of a 50% capture rate.

3   *(2)      Even if Barry's Testimony Was Improper, A New Trial on Damages is*

4   *Still Unwarranted Because the Other Evidence Presented at Trial Supports*

5   *the Jury's Award of Lost Profits*

6       Even if Barry's assumption of a 50% capture rate was unsupported by the

7   facts, as MOC contends, a new trial would still be inappropriate because other

8   evidence in the record establishes the absence of acceptable non-infringing

9   substitutes and supports the jury's award of lost profits.  At trial, Hischier testified

10  that MOC and ITW were head-to-head competitors in the market to supply

11  atomizing induction tools to car dealerships.  (Trial Tr., Day 4, 183:1–184:6.)  He

12  testified that the two companies "quite often" bid on the same customers and even

13  "traded the business" back and forth several times at one major dealership.  (*Id.* at

14  183:15–18.)  He also testified that MOC and QMI's non-infringing induction tools

15  were inadequate substitutes because they did not atomize liquid cleaner.  (*Id.* at

16  188:7–13.)  Finally, Hischier also testified that BG's pressurized tools were

17  significantly more expensive and more complicated to use than MOC's or ITW's

18  induction tools and would not be considered acceptable substitutes by most

19  customers.  (*Id.* at 187:1–24.)  Based on this evidence, the jury was free to conclude

20  that there were no acceptable non-infringing substitutes and to award lost profits on

21  all of MOC's infringing sales.  *See Bic Leisure Prods.*, 1 F.3d at 1219 ("[Competing

22  products were not acceptable substitutes because they] differed significantly in terms

23  ─────────────────

24      [3] MOC has argued that ITW's "hybrid" approach to calculating lost profits is impermissible because Barry's acknowledgment that competing products would capture

25  sales absent MOC's infringement is evidence that those products are acceptable substitutes, such that the *Panduit* factors are not satisfied.  Products that are

26  substantially more expensive or that differ significantly from the patented technology are not acceptable substitutes, however, even if they may possibly capture some of the

27  infringing sales.  *See, e.g., Bic Leisure Prods. v. Windsurfing, Int'l, Inc.*, 1 F.3d 1214, 1219 (Fed. Cir. 1993) ("[To be acceptable, an alternative] 'must not have a disparately

28  higher price than or possess characteristics significantly different from the patented product.'" (quoting *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1142 (Fed. Cir. 1991))).

- 9 -

09cv1887

of price, product characteristics, and marketing channels"); *see also Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1270 (Fed. Cir. 2008) ("[A] non-infringing replacement product is not considered a substitute unless it is 'acceptable to *all* purchasers of the infringing product.'" (emphasis added)).

Moreover, lost profit awards may be based on a showing of absence of acceptable non-infringing substitutes, even where the patent holder concedes that competing products would likely pick up some of the infringing sales. For example, in *TWM Manufacturing Co. v. Dura Corp.*, the Federal Circuit upheld an award of lost profits despite "the concession of [the patent holder's] witness that competition existed in 30% of the market." 789 F.2d 895, 901 (Fed. Cir. 1986). The court noted that, despite this testimony, there were many "facts clearly establishing [the] absence of acceptable substitutes." *Id.* The same reasoning applies here. Although Barry effectively conceded that there was competition in 50% of the market, the jury was still permitted to award lost profits given all of the evidence and testimony indicating that there were no acceptable substitutes.

Finally, there was evidence in the record indicating that MOC copied ITW's patent. (*See* Order on Post-Trial Matters 36–37, ECF No. 383.) Such evidence of copying may be sufficient to establish the absence of acceptable non-infringing substitutes. *See, e.g.*, *Minemyer v. R-Boc Representatives, Inc.*, No. 07 C 1763, 2012 WL 2155240 at * 11 (Jun. 12, 2013) ("[The] evidence at trial that the defendants copied the plaintiff's [patented technology] is . . . [an] indication of the absence of acceptable substitutes.").

In sum, MOC was not prejudiced by the jury's award of lost profits on only 50% of infringing sales when the evidence presented at trial was sufficient to support an award of lost profits on all infringing sales. Accordingly, the Court in its discretion declines to order a new trial on this basis.

///

///

09cv1887

**B.**      ***Barry's Testimony Regarding MOC's "Deluxe" Tool Does Not Warrant A New Trial***

MOC argues that Barry's testimony regarding MOC's Deluxe tool was undisclosed in his expert report and did not meet standards of reliability for expert testimony.  The Court finds MOC's argument unconvincing because (1) Barry's report addressed the Deluxe tool and his testimony was properly based on disputed facts regarding the tool's acceptability as a substitute; and, (2) even if Barry's testimony was inadmissible, the other evidence in the record supports the jury's award of lost profits.  The Court elaborates on each of these holdings in turn.

*(1)      Barry's Testimony Regarding MOC's Deluxe Tool Was Admissible*

MOC contends that Barry's testimony was inadmissible because Barry's expert report did not address MOC's Deluxe tool and failed to disclose that Barry would be relying on sales data at trial to prove that the Deluxe tool was not an acceptable substitute.  (Mot. for New Trial 15, ECF No. 422.)  Furthermore, MOC argues that Barry's trial testimony regarding the acceptability of the Deluxe tool as a substitute was unsupported by any independent research or testing and was entirely speculative.  (*Id.* at 16.)

As MOC concedes in its reply, however, MOC's Deluxe tool was explicitly addressed in Barry's supplemental expert report.  (*See* Resp. in Opp'n, Ex. 1, Suppl. Expert Report on Damages, ECF No. 435; Reply in Supp. 9 n.1, ECF No. 436 ("ITW's . . . expert mentions [the Deluxe tool] in his supplemental expert report.").)  At trial, Barry merely referenced data comparing MOC's sales after its introduction of the Deluxe tool in 2012 with ITW's sales of its induction tool during the same time period.  (Trial Tr., Day 6, 140:21–141:15; Trial Ex. 649.)  Even if Barry failed to disclose this line of reasoning before trial, this non-disclosure was harmless as Barry simply extrapolated from sales data that was already available to MOC.  *See* Fed. R. Civ. P. 37(c) ("If a party fails to provide information . . . required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence . .

1 | . at a trial, unless the failure was substantially justified or is harmless.").

2 | Moreover, Barry's testimony that the Deluxe tool was unacceptable as a
3 | substitute was not improper simply because he relied upon Hischier's view that the
4 | Deluxe tool fails to atomize liquid cleaner and therefore lacks the advantages of the
5 | patented technology. (Trial Tr., Day 4, 176:13–25.)  Although MOC disagreed with
6 | Hischier's version of the facts, an expert is permitted to rely on such disputed
7 | testimony. *See Micro Chem.*, 317 F.3d at 1392.

8 | (2)    *Even if Barry's Testimony was Improper, a New Trial on Damages is Still*
9 | *Unwarranted Because the Other Evidence Presented at Trial Supports the*
10 | *Jury's Award of Lost Profits*

11 | Even if MOC is correct that Barry's trial testimony regarding the Deluxe tool
12 | was improper, the jury's award of lost profits must stand because, as explained
13 | above, there was ample evidence in the record indicating an absence of acceptable
14 | non-infringing substitutes.  Hischier testified that MOC and ITW were head-to-head
15 | competitors in the market to supply atomizing induction tools to car dealerships and
16 | that, had MOC's infringing tool been removed from the market, ITW would likely
17 | have picked up MOC's accounts. (Trial Tr., Day 4, 186:14–21.)  He explained that
18 | MOC and QMI's non-infringing induction tools were inadequate substitutes because
19 | they did not atomize liquid cleaner. (*Id.* at 188:7–13.)  Specifically, Hischier
20 | explained that the location of the air bleed tee on the prior art tools was responsible
21 | for those tools' inability to atomize cleaning fluid. (*Id.* at 156:21–157:10.)  Hischier
22 | testified that, when the air bleed comes in "too early," the cleaning fluid is allowed
23 | to "puddle up in larger groups and be emitted in large shots, [which is] why it
24 | sputters." (*Id.* at 165:22–25.)

25 | MOC's Deluxe tool is similar to the prior art Heavy Duty Induction Canister
26 | tool in many respects, including the location of the air bleed tee well above the
27 | nozzle.  Hischier testified that the Deluxe tool emitted a "sputtering stream," rather
28 | than a fine mist, and, as with MOC's old tool, Hischier ascribed this poor

performance to the location of the air bleed.  (*Id.* at 176:24; 177:4–13 ("[H]aving the air bleed this far away or several inches away from the nozzle will impact how the bubbles will form in that section, but the second air bleed at the top compounds that so it turns out not to be a very good way to atomize the fluid coming out of the tip.").)  Hischier's testimony regarding the Deluxe tool, as well as MOC's and QMI's other induction tools, suggests an absence of acceptable non-infringing substitutes and supports the jury's award of lost profits.

Furthermore, as discussed above, the evidence of copying in the record also points towards an absence of acceptable non-infringing alternatives and supports the jury's award of lost profits.  *See Minemyer*, 2012 WL 2155240 at * 11.  Accordingly, the Court in its discretion declines to order a new trial on damages.

## CONCLUSION

For the reasons stated above, the Court **DENIES** MOC's motion for a new trial.

**IT IS SO ORDERED.**


DATED:  June 2, 2014

Honorable Janis L. Sammartino
United States District Judge